FIRST NATIONAL BANK IN WICHITA, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 29675, 42106. Promulgated April 28, 1930.

*Phil D. Morelock, Esq.,* and *Dudley Doolittle, Esq.,* for the petitioner.

*Philip M. Clark, Esq.,* for the respondent.

OPINION.

LANSDON: The petitioner claims that the several amounts added to its gross income by the respondent for each of the years involved represented tax-exempt income derived by it from interest on Federal, state and municipal securities acquired and held by it under the circumstances set forth in the findings of fact.

At the outset it is clear that the transactions involving the year 1922 must be eliminated from our consideration, since there is nothing definite in the record to show what deals, if any, were carried on during that year to which the repurchase contract, in evidence, might apply. The evidence shows that prior to sometime during 1922 the bank carried on its transactions under a form of agreement differing from the one in evidence; that sometime late during 1922 it adopted the form used during the remainder of the years in controversy, but it fails to establish the time such new contract was put into effect. The form submitted to the Comptroller of Currency was approved by him on November 25, 1922, and the witness testifying as to the actual date when it was put into use stated that it was *sometime during 1922 or 1923*. In the absence of evidence to show how the petitioner's business for 1922 was conducted, we are unable to say that the respondent erred in his determination for that year. His conclusion, therefore, for such year must be sustained.

In respect of the petitioner's transactions wherein, during the years involved, it acquired, held, and resold certain tax-exempt securities in accordance with repurchase agreements as shown, the petitioner states that this plan was evolved to enable it to supply its customers with money in amounts in excess of the legal loan limit allowed to national banks to single customers, and that this plan had the full and complete approval of the Comptroller of Currency.

The petitioner solicited the business of the Brown-Crummer Co., the bulk of which, prior to late in 1922, had been carried with another bank, which had gone into liquidation. Witness Chandler, chairman of petitioner's board of directors, states that Brown-Crummer's transactions in bonds amounted to, at times, $5,000,000 to $6,000,000, and that " we asked them to let us have them," inasmuch as he explained " they had carried them with somebody else; * * * with terms of purchase, and we were carrying this money."

It seems clear that at the time the petitioner solicited this business from the Brown-Crummer Co. it had on hand a large surplus of unemployed funds and that that company was in the market for loans. The maximum amount of credit the petitioner could extend to this company by way of a direct loan, under the law, was $200,000; this credit it readily gave to the company upon its collateral note. The company, however, required amounts greatly in excess of this; and, since it was dealing in large issues of municipal securities which constituted approved banking investments, the sale with repurchase agreement was evolved and brought into play. The petitioner contends that through this process it acquired a complete title to these bonds which the repurchase agreement in no way impaired, and that, because of that fact, the interest payments were its income,

and being tax-exempt, it was entitled to exclude them from its income-tax returns. We think there could be no question as to the soundness of the petitioner's contention had it taken title to these securities subject to no conditions other than is evidenced by the repurchase agreements; however, other established facts show that other considerations formed the motives of the parties to the transactions.

The question here, as we view it, is not dependent upon who held the bare legal title to the bonds during the dates of sale and repurchase, but rather upon the broader issue as to whom, under the understanding between the bank and its customers, was entitled to receive, and who, as carried out, did receive the interest payments made by the issuing authorities of such bonds when collected and paid. The record shows that the true relationship between the petitioner and its customers, in these transactions, was that of a lender of money in consideration for the legal rate of interest payable on the amount advanced, and not that of an investor in the securities assigned to it by such customers. The history of these transactions and the manner in which they were carried out can lead to no other conclusion.

In explaining how these transactions were initiated and carried out, Gillespie, vice president of the Brown-Crummer Co., said:

When it was necessary to borrow money we would take to the First National Bank bonds or securities and lodge them there under what we called a repurchase agreement. The repurchase agreement bore a stated rate of interest irregardless of the coupon rate or their maturity or market value of when they were payable. We were permitted to substitute from time to time and place other bonds of equal value in the repurchase agreement. When we would want to liquidate them we would pay off our loan and take down our bond.

Upon this subject, the petitioner's president Carson, in his deposition, stated that the company paid the loan rate of interest upon the amount advanced, monthly; also that:

We delivered the coupons to them and rather than take two checks for them, one for the amount of coupons and another for the amount of the excess interest, we took one check once a month. In the case of bonds which we had purchased outright from them which were not on the repurchase agreement, they, of course, gave their own check payable the date the coupon was due.

When further asked as to how the bank handled the unmatured coupons, the witness said:

I should say that they were not handled—in most of these cases—in all of them I should judge—we let the coupons go. If they took the bond in the meantime they took the coupons—they paid us interest, discount interest.

Witness Mrs. Young, bond teller for petitioner, stated that she kept a record of the date of each coupon when due, that she per-

sonally clipped all coupons, and that in respect to these bonds with repurchase agreement attached "they are always delivered to our customer or credited to his account"; that this was done "to simplify matters" and do away with "extensive bookkeeping."

The true relationship between the petitioner and the customer, in these transactions, was that of borrower and lender, in which the securities were employed as a mere convenience. In these circumstances, the *ad interim* ownership of the bare legal title to the bonds would not affect the character of the transactions between the parties or change their true relationship. *Peugh* v. *Davis*, 96 U. S. 332; *Jackson* v. *Lawrence*, 117 U. S. 679; *Morris* v. *Nixon*, 1 How. 117; and see also *Russell* v. *Southard*, 12 How. 139.

In view of the facts hereinabove set forth and of the further circumstances that the entire record fails to show any instance in which the petitioner ever benefited by the excess interest paid on coupons over the rate charged its customers for the use of the money advanced on the bonds from which they were clipped, we are unable to now say that the respondent erred in holding that the petitioner did not in fact receive such payments as claimed. The action of the respondent is, therefore, affirmed.

Reviewed by the Board.

*Decision will be entered for the respondent.*

SMITH and TRAMMELL dissent.