**AMERICAN NATIONAL BANK OF AUSTIN**

v.

**UNITED STATES of America.**

**Civ. A. No. 67–38–A.**

United States District Court
W. D. Texas,
Austin Division.

Oct. 11, 1968.

William H. Neary, J. W. Bullion and Buford P. Berry of Thompson, Knight, Simmons & Bullion, Dallas, Tex., and Sander W. Shapiro of Clark, Thomas, Harris, Denius & Winters, Austin, Tex., for plaintiff.

Stanley F. Krysa, Dept. of Justice, Washington, D. C., John O. Jones, Atty., Tax Division, Dept. of Justice, Fort Worth, Tex. (Also U. S. Atty., San Antonio, Tex.), for defendants.

MEMORANDUM AND ORDER

ROBERTS, District Judge.

Plaintiff, the American National Bank of Austin, seeks to recover income tax and interest assessed against it in the amount of $788,031.77 for the taxable years 1962–1964. This case was tried before this Court without a jury.

During the years involved (1962–1964), the bank entered into transactions with certain bond dealers. In these transactions the bank would take delivery of municipal bonds either directly from the issuing authority for the account of the successful bidder-dealer or from one dealer for his account where he purchased from another dealer. Pay-

ment for the bonds would be made entirely by the bank; not the dealer. The bank would send payment to the depository bank of the issuing authority. The bank retained possession of the bonds, which were payable to bearer.

A repurchase agreement was also part of the transaction between the bank and the dealer. Under this agreement, the bank agreed to give the dealer the right to repurchase the bonds from the bank at book value plus any accrued interest, sales expenses, and handling charges. The dealer was not obligated to buy the bonds, but merely had the first shot at them. If the dealer did not exercise his option to buy the bonds, the bank could sell them to any other buyer and the bank was to absorb any loss or gain on the sale.

During the time the bank held bonds purchased under this arrangement, it received the interest due on the bonds. In filing tax returns for the years in question, the bank claimed this interest was exempt under Sec. 103(a) (1) of the Internal Revenue Code of 1954 that excludes from gross income the interest on the bonds of any state or political subdivision. The District Director of Internal Revenue determined that this interest represented interest earned on loan transactions and ruled that the interest constituted taxable income. This ruling produced a deficiency in taxes, which the bank paid. After filing the pre-requisite claim for the refund of the taxes paid on this interest, the bank brought the instant action to recover the taxes paid on this interest.

The issue in this case is whether the bank was the true owner of the bonds and entitled to treat the bond interest collected as its own tax-exempt interest, or whether these transactions were merely loans under which the bond interest was the property of the dealers but collected by the bank as compensation for the use of its funds and thus taxable income to the bank.

In summary, the bank's position is that it was the true owner of the bonds in question and therefore entitled to exclude the interest from its taxable income. The Government's position is that these transactions were not sales, but rather loans, and that the bonds were merely used as security for the loans; hence, the interest belongs to the dealers, who are the only persons who can claim the tax-exempt character of this interest.

■ The Government correctly argues that substance should control over form and that the intent of the parties is an important factor. The court agrees with the government's statement of principle, but disagrees with its subsequent conclusion.

The only cases in point support the bank's position. In First Nat'l Bank in Wichita v. Commissioner of Internal Revenue, 19 BTA 744 (1930), aff'd, 57 F.2d 7 (10th Cir. 1932), cert. denied, First Nat'l Bank in Wichita v. Burnet, 287 U.S. 636, 53 S.Ct. 86, 77 L.Ed. 551, the court found that the true relationship between the bank and its customers was that of a lender of money in consideration for the legal rate of interest payable on the amount advanced. However, the court in that case stated a test that favors the bank in the instant case:

> The question here, as we view it, is not dependent upon who held the bare legal title to the bonds during the dates of sale and repurchase, but rather upon the broader issue as to whom, under the understanding between the bank and its customer, was entitled to receive, and who, as carried out, did receive the interest payments made by the issuing authorities of such bonds when collected and paid.

*Id.* at 19 BTA, 749.

In *Wichita,* the *dealer-customer* received the interest payments; in our case, however, the *bank* received the interest payments. It is clear that here all of the parties concerned—the bank, the dealers, and the issuing authorities—felt that the bank was entitled to receive the interest payments. Hence, *Wichita* seems to support not the Government but the bank.

Moreover, there are significant factual differences between *Wichita* and this case. In *Wichita,* the taxpayer-bank *advanced* to certain customers the face value of securities that were assigned to the bank, without any regard to their market value. In our case, the bank *bought* the bonds at market value. In both cases the repurchase agreement was basically the same: that the customer had the privilege of repurchasing the securities assigned to the bank at their original purchase price, and if the customer failed to exercise this privilege the bank could sell the securities in the market. However, unlike our case, the customer in *Wichita* was obligated to make up any loss incurred by the bank on such sale. Moreover, the dealer in *Wichita* paid the bank a regular monthly payment, suggesting a lender-borrower relationship. The dealer's only payment in the instant case was for the entire cost of the bonds, plus the accrued interest and expenses. Also, whereas in *Wichita* the customer was allowed to substitute bonds of a like character and value, which further suggested a loan relationship, substitution was not present in this case.

The Government contends that the *Wichita* case supports its position. Although the Government admits that there was no *Wichita*-type agreement in this case by the dealers to reimburse the bank against any loss resulting from a subsequent sale of the bonds, the Government contends that the custom and practice of the parties in this case place this case essentially on the same footing as the *Wichita* case. However, the distinctions discussed in the preceding paragraphs require the conclusion that the Government's argument is without merit.

The Government also points out that the court in *Wichita* suggested that if the bank could demand repurchase of the bonds, the transaction would be a loan for the purposes of the legal lending limits. The Government goes on to argue that the parties in the instant case were under a similar agreement that the bank could demand repurchase of the bonds. In support of this contention, the Government submits that a letter from Mr. Houser, Vice-President of the bank, to a James C. Tucker Co. indicated that there was an agreement by Tucker to repurchase the bonds upon the bank's request and that therefore it is reasonable to conclude that the same sort of agreement existed between the bank and the numerous other dealers involved in the transactions in question. It is clear to the court, however, that this Tucker letter did not represent the transactions before the court now. In the transaction reflected by this letter, the bank had agreed to purchase for a second time an issue that had been criticized by the bank examiners. The Tucker Co. and the bank agreed that if the bank examiners criticized these bonds again Tucker Co. would repurchase them. The bank examiner did criticize them again, and the bank requested that Tucker Co. repurchase them. There is no testimony in the record to indicate that this was anything but an unusual transaction. Moreover, there is abundant testimony that the dealers and the bank always considered that the dealers had a right to repurchase the bonds, but that the bank did not have the right to require the dealers to repurchase the bonds.

The other leading case in the area is Bank of California, National Association v. Commissioner of Internal Revenue, 30 BTA 556 (1934), aff'd Commissioner of Internal Revenue v. Bank of California, 80 F.2d 389 (9th Cir. 1935). There the bank acquired tax exempt securities from certain investment dealers and at the same time entered into a repurchase agreement with the dealers. The instant case is similar to that case in that in both the purchase price was based on market price; the interest received by the bank was the coupon interest, at the coupon rate, which it collected for its own account and treated as tax exempt; the interest was collected only when coupons became due (or on an accrued basis of unmatured coupons when the

securities were sold). Unlike our case, the agreements provided that the dealer was legally obligated to repurchase the securities upon tender by the bank. If the dealer refused, the bank could sell them, and the dealer would be obligated to absorb any loss incurred by the bank on the sale. In our case, the dealer merely had an option and not an obligation to repurchase and was not liable for any subsequent loss.

In Bank of California, the court, in following the Wichita test, determined that the bank was the owner of the securities and was entitled to the interest received therefrom. The interest thus received was therefore held to be tax exempt.

The Government attacks the Bank of California case on two grounds. First, the Government contends that the case was incorrectly decided because the court placed too much emphasis on the form of the transaction indicated by the documents. It is the opinion of this court that the case is good law. Second, the Government contends that the Bank of California case is clearly distinguishable from this case. The first distinction the Government offers is that whereas in Bank of California the bank did not have the authority to require the customer to repurchase the bonds, the bank in the instant case had the authority to require the dealers to repurchase the bonds. This point has been discussed and found lacking in merit. The Government points out that during the years in question no dealer failed to exercise his option. Hence, the second basis of distinction is the argument that in substance there was a tacit obligation to repurchase the bonds. However, the testimony shows that the dealer could exercise his option at his discretion and that the bank could not have forced the dealer to buy the bonds. Moreover, two dealers in prior years did not exercise their options, which seems to corroborate the voluntary nature of the relationship.

From the fact that during the years in question no dealer failed to exercise his option, it does not follow that the dealers were required to exercise their option. The exercise of the option was not the result of legal obligation but the result of sound business judgment. If there was a profit to be made by the exercise of the option, the dealer understandably wished to take that profit. Often, however, dealers repurchased bonds at a loss. The Government points to these instances as an indication that the dealers were under an agreement to repurchase and that there was a loan relationship. This repurchasing at a loss does not support the Government's conclusion. Rather, it is a reflection of sound business judgment based on the desire of the dealers to maintain this relationship with the American National Bank because the bank, due to its location in Austin, Texas, can save them money by reducing shipping, handling and communication costs.

Finally in the Wichita case, the court emphasized the fact that the transaction evolved to circumvent the legal loan limits. The bank here entered the bond business to make money, not to evade taxes or circumvent loan restrictions. This method of doing business allowed the bank to put idle funds to work in short-term investments and indirectly afforded the bank a real opportunity to be of service to the State of Texas and its political subdivisions.

 Hence, the case law strongly supports this court's conclusion that the bank should prevail.

The basis of the decision in this case will be made clearer by discussing some of the arguments that the Government offers in support of its contention that the interest should be considered interest paid on a loan and not interest paid the true owners of the municipal bonds.

The Government contends that the bank paid the dealers less than market price for the bonds and that this constituted inadequacy of consideration, which suggests in turn that the bank was making a loan to the dealers rather than an actual purchase of bonds. This contention is based on the fact that often

at the time the bank bought the bonds from the dealer, the dealer had already sold some of the bonds for a profit. Closer analysis of the business realities of the situation indicates that the government's contention is without merit. When the bank purchased bonds from the dealer, it purchased the entire issue at the price the dealer had agreed to pay the issuing authority, which of course, was at that time the market value. This price was still the market value when the bank, usually a very short time later, bought the bonds for that price from the dealer. The fact that the dealer had already sold some of the bonds for a profit merely reflects the fact that the specific investor is willing to pay higher prices to secure only the particular maturities he wishes for his portfolio, depending on whether he wants bonds with short maturities or long maturities. The total price paid for the bonds sold individually to a number of investors, which reflects fair market value on the individual sales, is not representative of the fair market value on the sale of the entire issue.

The Government also contends that the language used by the dealer when he wanted the bank to buy bonds under this arrangement suggest that the bank was holding the bonds as security on a loan. Typical language used was, "Take (the bonds) up for our accoutn"; "We would appreciate your accepting these bonds for our account, paying them their figures."

The bank's reply is persuasive. There was abundant testimony before this court that the dealers meant by this language that the bank was to purchase the bonds subject to the dealer's right to re-purchase. This kind of language appears to be a recognized type of trade language with this commonly understood meaning. The Government insinuates that the almost identical testimony of several dealers to this effect suggests a lack of credibility. The more reasonable conclusion would seem to be that the meaning of this type language used in this kind of situation by dealers in bonds is so crystal clear that similarity in interpretation is inevitable.

Another aspect of the Government's form over substance argument is that these transactions, by allowing dealers to in effect keep larger "inventories" of bonds and by allowing the bank a short-term return on its money similar to a loan, were in substance loans. This contention is also not persuasive. The bonds in question were not part of the inventory of the dealers, nor were they carried on their records as inventory. The result of this kind of transaction between the bank and the dealer is merely that the dealer does not carry in inventory bonds he otherwise might carry if he financed them or paid for them with his own funds. But this does not change the substance of the transaction to a financing transaction. The dealer simply selected this method of doing business rather than buying them with his own money or borrowing money. But the Government cannot argue that since the dealer might have accomplished the result through one means, he necessarily is using that means to accomplish the end result. Both the Government and the taxpayer must accept the tax consequences of what has been done and not what could have been done.

Moreover, the record establishes that the bonds were sold by dealers to the bank, not because the dealer wanted to carry an inventory that he otherwise could not have carried, but because of the unique services provided by the bank. The bank's long experience in the trading of municipal bonds was stipulated in great detail; the bank's geographical location is an important reason for the bank's importance in this field because of its proximity to the part's state government related to municipal bonding. By selling bonds to the bank, dealers save great amounts of money by eliminating a duplication of shipping, book-keeping, and communication costs.

The Government seems to base much of its argument on the notion that when a dealer gave the bank the right to buy the bonds, the transaction was either

an absolute sale with the bank having all incidents of ownership or a loan. Hence, the Government contends that the transactions must have been loans since the following facts clearly show that they were not absolute sales: the bank sold the bonds back to the dealers who exercised the repurchase agreement for no "profit"; the bank held the bonds until the dealer found a customer for them; the dealers were expected to and did offer the bonds for sale to their customers; and the bank never refused to convey bonds it held subject to a repurchase agreement when that dealer requested the bonds.

None of these facts, however, is inconsistent with the bank's ownership of the bonds subject to an option by the dealer to repurchase them. The government's "absolute sale or loan" argument is without merit because it ignores this perfectly legal kind of relationship. Also, as the bank points out, if a loan were created by the fact that the giver of an option expected the optionee to exercise that option by offering to sell the property covered by the option, many common option transactions would be turned into loans. Moreover, the fact that the bank made no "profit" in the sense of appreciation on the sale is irrelevant to the crucial issue in this case. The bank sought this kind of investment for the tax-exempt income. The transactions in question served this legitimate business purpose and gave the bank, if a dealer did not exercise his option, a possible opportunity to make a further profit by selling the bonds in the open market.

In this case, there has been no attempt to convert ordinary income into exempt income nor has there been any attempt to circumvent legal loan limit restrictions. The bank acquired for its own account municipal bonds. In deciding whether to purchase the bonds the bank made no credit investigation of dealers but investigated and looked only to the credit of the issuing authority. It paid with its own funds market value for the bonds.

The interest received by the bank was the coupon interest, at the coupon rate. Interest was received only when coupons became due or on the sale of a security to the extent of interest accrued on unmatured coupons. Dealers, while having a preferential right to purchase the securities, had no legal obligation to purchase the securities. In the event a dealer did not elect to exercise his preferential right to purchase the securities, a loss or gain on a sale by the bank in the market did not give rise to an obligation of the dealer to make up the loss nor a right to the surplus received. The bank and each dealer at all times treated the securities, the coupons and the interest received as property of the bank, who carried as assets the bonds on its financial reports and call statements. Dealers did not show the bonds owned by the bank as assets on their financial statements. The purchasing bank in every respect considered, and reflected on its books, that it purchased the bonds from the bank and then owned the bonds. In making loans, the bank almost always required that the borrower maintain with it a banking relationship and the borrower was normally required to maintain a compensating balance of at least 10% of the loan. Yet, the bank bought bonds from and sold bonds to dealers without reference to any banking relationship and without any request or requirement therefor. The bank as a national bank, could not, under regulations of the Comptroller of the Currency, make loans unless they were evidenced by a note or some other kind of debt instrument. No note or other instrument evidencing loans from the bank to dealers was executed. The bank in numerous instances owned bonds on which the aggregate option price would range from 10 to 20 times the loan limit of a loan to the dealer. During the years in question the trading by the bank in municipals was subjected to the scrutiny of the Comptroller of the Currency and the Comptroller ruled that the bonds reflected in the Bank's trading account are the property of the bank.

The rule of law established by court decisions when applied to the facts before this Court can result in no other conclusion than a decision that the bank, in form and substance, was the owner of the municipal obligations and the interest income received by it was interest on the municipal obligations and therefore exempt to it under the provisions of section 103.

It is therefore, ordered, adjudged, and decreed that the United States of America make the necessary adjustments with the taxpayer to allow him to exclude from his gross income for the years in question the interest from the coupons involved in these transactions and to allow the bank a refund on its investment credit in the sum of $6,292.90, which, as the Court understands it, is not contested by the Government.