**UNION PLANTERS NATIONAL BANK OF MEMPHIS, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 67–102.**

United States District Court
W. D. Tennessee, W. D.

Oct. 24, 1968.

Cooper Turner, Canada, Russell & Turner, John C. Kimbrough, Memphis, Tenn., for plaintiff.

Stanley Krysa, Tax Div., Dept. of Justice, Washington, D. C., Thomas L. Robinson, U. S. Atty., Memphis, Tenn., for defendant.

**1152**

## OPINION

ROBERT M. McRAE, Jr., District Judge.

■ The Plaintiff, Union Planters National Bank of Memphis, brings this suit to recover income taxes paid by it pursuant to assessments of the Commissioner of Internal Revenue for the taxable years 1961, 1962, 1963 and 1964. The controversy concerns the applicability of 26 U.S.C. § 103 which exempts from income taxes the interest on bonds of a state or any political subdivision thereof. Such bonds hereinafter will be called municipal bonds. The Bank did not report as income the interest it received on municipal bonds which were subject to repurchase agreements. These repurchase agreements pertain to transactions between the Bank and security dealers, who transferred the municipal bonds to the Bank for an agreed price plus accrued interest and later reacquired the bonds. During the period that the Bank held the bonds it collected the interest provided for on the coupons attached to the bonds. The Bank contends that it was the owner of the bonds during that period and, therefore, the interest it collected was tax-exempt. The Commissioner contends that the transaction was a loan by the Bank to the dealer whereby the municipal bonds were used as collateral; therefore, the interest received by the Bank was, in fact, interest paid by the dealer on a loan and the interest lost its exempt status.

The determination of this case requires an inquiry into the intent of the parties. The intent of the parties must be determined by the facts and circumstances reflected by the proof in the cause. The significant facts established by the proof are found by the Court to be as follows:

The plaintiff is a National Bank of significant stature in Memphis, Tennessee, and the surrounding area. As of December 31, 1962, the financial statement of the Bank indicated it had resources of $489,625,000.00. In 1938 or 1939 the Bank commenced a practice of entering into repurchase agreements with security dealers in Memphis and the surrounding territory. In these transactions the security dealers had agreed to purchase all, or part, of a bond issue from the state or municipal authority in the regional area. After delivery of the bonds, the dealer took the bonds to the Bank and transferred them to the Bank for money based upon an agreed price which purported to be the cost price. In the usual practice this price was set by the head of the Bond Department of the Bank. The price was less than par value of the bonds and usually the dealer's cost. The transfer was called a sale from the dealer to the Bank and under the terms of the agreement the dealer agreed to repurchase the bonds upon demand by the Bank. The dealer . further agreed that the Bank would incur no loss in the transaction. In about 1951, at the suggestion of the Bank Examiners, a written agreement to this effect was adopted and used in most of such subsequent transactions. This written agreement was in use for the years involved in this suit. In some cases no written agreement was executed for transactions of this character, but the bonds were transferred subject to the same terms as those of the written agreement.

Although the written agreement did not so provide, it was the intent and practice that the bonds be re-acquired by the dealer upon the dealer's request and payment of the value of the bonds. The length of time that the Bank usually held the bonds varied. In most instances the dealer re-acquired the bonds in less than six months. At the time of the transfer of the bonds by the dealer to the Bank, in addition to the agreed purchase price of the bonds, the dealer received accrued interest calculated from the last date that interest was paid by the issuing authority. If the coupons providing for the payment of interest became due while the Bank held the bonds, the Bank invariably clipped the coupons and collected the interest from

the issuing authority. Upon the reacquisition of the bonds by the dealer the Bank collected accrued interest to the date of re-acquisition. The repurchase price was based upon the amount originally paid to the dealer and the Bank made no additional charges nor received any compensation other than the coupon interest.

In some instances the dealer did re-acquire in several transactions less than all of the bonds that the dealer had transferred to the Bank originally. On some of those partial re-acquisition transactions the dealer did not receive the full prorata portion of the original price of the bonds. The amount received was determined by the date when certain bonds within the issue became due, which is a determinative factor in prices of bonds within the same issue.

The record also reflects that on some occasions the Bank required the dealer to pay additional monies while the Bank held bonds acquired from that dealer. This was considered by the Bank to be an adjustment of the original purchase price and necessary to protect the Bank with regard to that portion of the agreement whereby the dealer agreed that the Bank would not incur any loss on the transaction.

In some instances the Bank, on instructions from the dealer, delivered some of the bonds to customers of the dealer in lieu of transferring the bonds back to the dealer. In those instances, the Bank settled with the dealer upon the price paid to the dealer and the dealer realized as profit the amount of the excess charged to the customer.

In 1957, the Comptroller of Currency issued a ruling requiring this Bank and others to show repurchase transactions on the books of the Bank as loans. In March 1964, the Comptroller of Currency reversed this ruling. During the period that the Bank was required to indicate that repurchase securities were loans, the Bank complied with the requirements of the Comptroller and reported the transactions in its financial statements as "Loans in Repurchase Agreements on Securities". At all times the Bank's books have reflected these transactions in a manner different from municipal bonds which the Bank held for re-sale to Bank customers or which it held in its own investment account. In some instances the Bank actually purchased bonds that it was "carrying" under repurchase transactions. When this was done the Bank paid the dealer the difference between the repurchase price and the market price and appropriate entries were made transferring the bonds on the books of the Bank to a different category of ownership.

The proof reflects that the dealers who had transferred securities to the Bank in transactions of this sort treated the bonds differently during the period the Bank actually held the bonds. Some dealers treated the bonds as their own assets and showed a corresponding liability to the Bank on their financial statements. Other dealers reflected a contingent liability to the Bank based upon their obligation to repurchase upon demand from the Bank. There is no evidence that the Bank voiced any control over how the dealers handled the transaction. One dealer advertised for sale to its customers those bonds which had been transferred to the Bank. Presumably, this was based upon the understanding and fact that the dealer could re-acquire the bonds upon its request at any time. If a customer of the dealer wished to buy the bonds, the dealer could request the bonds from the Bank and make a profit on the sale to the customer of the dealer.

Negotiations for the repurchase agreement and decision of a discretionary nature pertaining to the agreements were made by the head of the Bond Department of the Bank. These transactions were not presented to the Loan Committee of the Bank which was required by bank practices to approve loans made by the Bank. Although the dealers usually had a line of credit with the Bank and were loan customers for other type transactions, the amounts involved in the repurchase transactions

were never sufficient in size to suggest that the repurchase agreements were an effort to circumvent the laws and regulations which limit the amount that a bank might lend any one person or company.

There have been three instances whereby dealers who had transferred bonds to the Bank were unable to repurchase the bonds. In those instances which arose by transfers originating in the years 1945, 1955 and 1956, the Bank subsequently, upon failure of the dealer to re-acquire the bonds after demand, either sold the bonds to third parties or retained the bonds as the Bank's own investment. Profits realized from these transactions were retained by the Bank and not delivered to the defaulting dealer.

■ From all of the facts reflecting upon the intent of the parties, the Court finds that the Bank was the owner of the bonds and interest coupons during the period between the transfer by the dealer to the Bank and the re-acquisition of the bonds by the dealer. In this regard, it should be noted that it is significant that coupons which contain the right to collect interest from the issuing authority may have separate ownership. Edwards v. Bates County, 163 U.S. 269, 16 S.Ct. 967, 41 L.Ed. 155; Nesbit v. Riverside Independent District, 144 U.S. 610, 12 S.Ct. 746, 36 L.Ed. 562; First National Bank in Wichita v. Commissioner of Internal Revenue, 57 F.2d 7 (C.A.10, 1932). Although some of the facts suggested loan transactions with regard to the bonds, the facts of the instant case clearly establish that the Bank exercised all elements of control and collection over the interest coupons while it held the bonds.

■ In addition to the determination of the intent of the parties the purpose of the transactions should be considered. The tax-exempt status of municipal bonds was established by Congress "to aid in the flotation of government bonds and securities by making them tax free and therefore more attractive to inves-

tors." Holley v. United States, 124 F.2d 909 (C.A.6, 1942), cert. den. 316 U.S. 685, 62 S.Ct. 1276, 86 L.Ed. 1757; American Viscose Corp. v. Commissioner of Internal Revenue, 56 F.2d 1033 (C.A. 3, 1932) cert. den. 287 U.S. 615, 53 S.Ct. 17, 77 L.Ed. 534. The proof in this case reflects, and the Court finds, that the Bank and dealers developed the repurchase practice primarily for the purpose of aiding the dealers in the handling of bonds from relatively small issuing authorities. Both the dealers and the issuing authorities were modest in size and therefore were not likely prospects to attract the larger national investment sources. The practice has been a stimulus to progress in the immediate geographical area served by the Bank and the dealers.

The proof also establishes that there were indirect benefits to the Bank from these repurchase transactions. They constituted short term ventures, which are necessary for the operation of a well run bank. Good will and business of the security dealers is promoted by permitting the dealers to purchase from the issuing authority and then reselling to the Bank in preference to the Bank being the purchaser direct from the issuing authority and then undertaking to sell the bonds to investors. Furthermore, the co-operative role of the Bank in the issuing authority-dealer efforts to float the bond issue stimulates the naming of the bank as trustee under the bond issue or the paying agency as well as increasing the deposits of the bank.

The Bank cites and relies on Bank of California v. Commissioner of Internal Revenue, 30 B.T.A. 556, affirmed in Commissioner of Internal Revenue v. Bank of California et al., 80 F.2d 389 (C.A.9, 1935). In that case a similar repurchase agreement was considered and the interest received by the Bank was found to retain its exempt status. This Court believes that the facts of the instant case are sufficiently similar to make that case persuasive authority in the determination of the issues in the instant case. The Commissioner in the

instant case relies upon First National Bank in Wichita v. Commissioner of Internal Revenue, supra, wherein the Court of Appeals for the Tenth Circuit affirmed a holding by the Board of Tax Appeals that the repurchase transaction in that case was, in fact, a loan and that the dealer continued to own the interest coupons. This Court is of the opinion that the facts of the instant case are clearly distinguishable from the Wichita Bank case. In the Wichita Bank case the Bank charged the dealer interest on a monthly basis and when the coupons became due the Bank delivered the interest coupons to the dealer. Furthermore, the interest charged to the dealer was not in all instances the same as the interest provided for on the bonds. In the Wichita Bank case the dealer substituted bonds during the course of the transaction. In the instant case no substitution was made and the bonds transferred by the dealer and re-acquired were in all instances identical.

For the reasons set forth above, the Court is of the opinion that the Bank was entitled to treat the interest received by it from municipal bonds as tax-exempt and therefore the Bank is entitled to a judgment for recovery of the tax heretofore assessed by the Commissioner.