**AMERICAN NATIONAL BANK OF AUSTIN, Plaintiff-Appellee,**

v.

**UNITED STATES of America, Defendant-Appellant.**

**No. 27301.**

United States Court of Appeals
Fifth Circuit.

Jan. 19, 1970.

Rehearing Denied Feb. 18, 1970.

Seagal V. Wheatley, U. S. Atty., Warren N. Weir, Asst. U. S. Atty., San Antonio, Tex., John O. Jones, Atty., Tax Div., U. S. Dept. of Justice, Fort Worth, Tex., Johnnie M. Walters, Asst. Atty. Gen., Richard M. Roberts, Acting Asst. Atty. Gen., Lee A. Jackson, William A. Friedlander, Louis M. Kauder, Elmer J. Kelsey, Attys., Tax Div., Dept. of Justice, Washington, D. C., Ted Butler, U. S. Atty., of counsel for appellant.

Buford P. Berry, J. W. Bullion, Dallas, Tex., Donald S. Thomas, Sander W. Shapiro, Austin, Tex., for appellee.

Before GEWIN, THORNBERRY and AINSWORTH, Circuit Judges.

AINSWORTH, Circuit Judge:

The issue presented in this case is whether certain transactions of taxpayer, a national bank, with various municipal bond dealers during the years 1962–1964 are correctly characterized as sale-repurchase transactions, as the District Court concluded,[1] or whether they should be held to be secured-loan transactions for tax purposes, as the Government contends. If they were sale-repurchase transactions, the municipal bond interest collected by taxpayer during the years 1962–1964 should have been excluded from taxpayer's gross income as interest received on state governmental obligations owned by taxpayer. Int.Rev.Code of 1954, § 103(a) (1). On the other hand, if they were secured-loan transactions, this interest should have been included in taxpayer's gross income as taxable income realized by taxpayer from bond dealers for advancing funds on their behalf. Int.Rev.Code of 1954, § 61(a) (4).

This is a tax refund suit brought by taxpayer, the American National Bank of Austin, against the United States to recover income taxes and interest assessed against it and collected by the Commissioner of Internal Revenue in the amount of $788,031.77 for the taxable years 1962, 1963, and 1964. After a nonjury trial at which oral testimony and exhibits were received, together with a stipulation of facts and attached exhibits, the District Court agreed with taxpayer's contentions and ordered the refund. From this judgment the Government appeals.

During the years 1962–1964 taxpayer received income in the form of interest it collected or accrued on municipal bonds[2] while these bonds were in its possession. In its income tax returns for these years taxpayer excluded this interest from its gross income and computed its tax liability in reliance upon section 103(a) (1) of the Internal Revenue Code of 1954, which provides that a taxpayer's gross income does not include interest on municipal bonds.[3] The Commissioner determined that taxpayer was not entitled to the section 103(a) (1) income exclusion on the ground that taxpayer never acquired ownership of the bonds. Accordingly, he found deficiencies in taxpayer's reported tax liability for the years here in issue. Taxpayer paid the deficiencies and made refund claims asserting that the Commissioner's determination was erroneous. This suit fol-

---

1. American National Bank of Austin v. United States, W.D.Tex., 1968, 296 F. Supp. 512, 518.

2. As used here, the term "municipal bonds" refers to all types of state, county, and municipal obligations in which taxpayer dealt in the transactions here in issue.

3. Section 103 of the Internal Revenue Code of 1954 reads in pertinent part as follows:
   "(a) General rule.—Gross income does not include interest on—
   (1) the obligations of a State, a Territory, or a possession of the United States, or any political subdivision of any of the foregoing, or of the District of Columbia; * * *."

lowed the Commissioner's disallowance of taxpayer's claims.

Since sale-versus-loan cases turn upon their own particular facts, United States v. Ivey, 5 Cir., 1969, 414 F.2d 199, the decided cases [4] which have considered the precise question presented here offer little directional guidance toward a proper resolution of this case. We therefore take the route of ad hoc exploration through an expanse of essentially undisputed facts, see United States v. Winthrop, 5 Cir., 1969, 417 F.2d 905, to find that taxpayer was not entitled to the section 103(a) (1) income exclusion. The judgment appealed from must consequently be reversed.

## I.

Taxpayer is a national banking association.[5] Its banking house is located in Austin, the state capital of Texas, where practically all bond issues floated by political subdivisions of that state are examined, certified, and executed. Taxpayer's business in connection with municipal bonds began in the late 1930's when many Texas municipalities had bond issues outstanding which they desired to refund with new issues. Under then existing law, these municipalities could not refund issues piecemeal, but had to refund entire issues at one time. As a condition precedent to refunding, someone, a single concern or syndicate, had to acquire all the bonds in an issue.

■ When taxpayer began obtaining bonds to be refunded, it opened in its general ledger an account styled "Refunding Bonds Purchased." Taxpayer maintains this account as an asset account in which a balance is struck daily showing the book balance of bonds on hand at the close of the business day. Although taxpayer now engages in few transactions involving refunding, the account retains its original name, and into it are entered as assets all bonds that have come into taxpayer's possession as a result of the transactions here in issue.[6] Aided by its location, taxpayer has vigorously pursued its muncipal bond activity and now engages in transactions involving from 50 to 80 per cent of all bonds issued by Texas political subdivisions. During the years 1962–1964 taxpayer concluded with bond dealers approximately 4500 transactions in-

4. Commissioner of Internal Revenue v. Bank of California, etc., 9 Cir., 1935, 80 F.2d 389, aff'g B.T.A., 1934, 30 B.T.A. 556; Commissioner of Internal Revenue v. Wells Fargo Bank & Union Trust Co., 9 Cir., 1935, 80 F.2d 390; First Nat. Bank in Wichita v. Commissioner of Internal Revenue, 10 Cir., 1932, 57 F.2d 7, aff'g B.T.A., 1930, 19 B.T.A. 744; Union Planters National Bank of Memphis v. United States, W.D.Tenn., 1968, 295 F.Supp. 1151. An appeal by the Government in Union Planters is pending before the Sixth Circuit.

5. The parties prepared an extensive stipulation of facts subject to the following proviso: "The use of the words 'purchase', 'buy', 'bought', 'sell', 'sale' and 'sold' and words of similar import in this stipulation with reference to the transactions whereby [taxpayer] obtained possession of municipal bonds subject to a repurchase right in dealers or whereby other banks acquired bonds from [tax-

payer] shall not be deemed an admission by [the Government] that an absolute sale occurred." In summarizing the facts here, we have attempted to avoid the use of words of such conclusory import.

6. The record shows that taxpayer's holdings of municipal bonds were grouped in three categories. On December 31, 1963, for example, taxpayer held $14,664,501.36 worth of municipal bonds that were the subject matter of the transactions here in issue. Taxpayer's annual report for 1963 shows $16,583,244.13 debited to the asset account styled "State, County and Municipal Obligations." The difference between these two amounts—$1,918,742.77—was apparently owned by taxpayer free of any so-called repurchase option. The 1963 report also shows an asset account styled "Other Bonds and Securities," in which $174,250.00 is debited. Taxpayer purchased the last-mentioned bonds to obtain the coupon-paying agency of their issuers.

volving issues of municipal bonds in bearer form. Approximately 90 per cent, by dollar volume, of taxpayer's bond transactions involve new issues. The remainder of its transactions involve transfers from dealers rather than from issuing authorities.[7]

The distribution of a new issue of municipal bonds in Texas is commenced by the issuing authority when it publishes the official notice of sale. Such a notice generally will include statements of the amount of the issue to be floated, types of bids and interest rates, requirements regarding a good-faith deposit by the successful bidder, and the place designated for delivery of the bonds. As a general rule, bonds are made deliverable to taxpayer's banking house. If taxpayer's banking house is so designated, taxpayer first becomes involved in the distribution of an issue when the issuing authority notifies it of the successful bidder and authorizes it to deliver the bonds to the purchaser against payment of the specified bid price. The depositary bank of the issuing authority then advises taxpayer regarding transmittal to the depositary of the proceeds derived from the bond flotation. The bonds, following their approval and certification by the appropriate state officers, are then delivered to taxpayer. Upon receiving the bonds, taxpayer performs numerous functions on behalf of the issuing authority and the successful bidder-dealer. For example, it examines the bonds for printing errors, determines whether the correct number of coupons have been attached, obtains an opinion letter on the validity of the issue, and receives an undated receipt for payment of the purchase price to the issuing authority by the bond dealer.

Taxpayer concluded its new-issue transactions with bond dealers in either one of two ways during the years in issue. First, the successful bidder might pay taxpayer the purchase price of the bonds for transmittal to the depositary bank of the issuing authority. In this situation taxpayer would simply transmit the payment to the depositary and deliver the bonds to the dealer or at the dealer's order. For its services taxpayer would receive from the dealer a handling charge of 25¢ per $1,000 of par value and reimbursement for the expenses, such as insurance, postage, and wires, it had incurred.[8] Secondly, the successful bidder and taxpayer might agree that taxpayer's funds, rather than the bidder's funds, would be transmitted to the depositary of the issuing authority in payment of the purchase price bid by the dealer.

During the years 1962–1964 dealers occasionally wrote to taxpayer to request that taxpayer "make payment" to the issuing authority for bonds the dealers had been awarded and "accept delivery for our account" or "take [the bonds] up for our account." Usually, however, communications between the parties were by telephone. Taxpayer and the dealers made no written agreements regarding their various rights and obligations with respect to new issues. All these agreements, however, were the same.

Upon receiving the successful bidder's notification, taxpayer, if satisfied with the credit rating of the issuing authority, would pay with its own funds the full bid price to the authority and retain the bearer bonds in its possession. Taxpayer normally would agree to such arrangements with dealers if the issue was rated "BAA" or higher. Relying upon this rating, taxpayer would make no credit investigation of the dealer obligated to buy the bonds.[9] The dealer would

---

7. For tax purposes we see no distinction between taxpayer's activities in the new-issue and secondary bond markets. Accordingly, for the sake of simplicity we here concentrate on taxpayer's dealings in new issues. The legal consequences of both kinds of activity are the same.

8. Transactions of this type are not in issue here.

9. Taxpayer occasionally would receive unsolicited credit reports on dealers, but made no attempt to obtain such reports.

transmit no payment to the issuing authority, receive no payment from taxpayer, and execute no debt instrument of any kind.[10] After paying the issuing authority, taxpayer would send to the successful bidder a form notice captioned "The following securities were purchased today," which fully identified the purchased bonds.

Generally the official notice of sale would provide for a good-faith deposit by the successful bidder. At one time the notice normally specified that this deposit would be applied against the purchase price of the issue. During the years 1962–1964, however, the issuing authority in approximately 90 per cent of the new-issue transactions in which taxpayer was involved returned the successful bidder's deposit to the bidder upon receipt of payment from taxpayer. In approximately 9 per cent of these transactions the issuing authority sent the bidder's check to taxpayer. In approximately 1 per cent of the transactions the issuing authority negotiated the bidder's check in partial payment of the purchase price. When the issuing authority either sent the check to taxpayer or negotiated it, taxpayer made the dealer whole.

Taxpayer does not employ bond salesmen or sell bonds to the public. It cannot legally sell bonds to the public because it does not have a securities license. Although taxpayer legally may bid for new issues, it does not. Throughout the history of taxpayer's business in connection with new-issue bonds, the bonds for which taxpayer paid the original purchase price were offered and sold to the public by the

dealers who had successfully bid for them. These dealers offered bonds for sale to their customers both before and after taxpayer had made payment for them to the issuing authority. When a dealer was awarded an issue, he would begin selling bonds immediately for future delivery. Ordinarily a substantial portion of an issue would be sold before the bonds were actually issued and before taxpayer had paid the issuing authority for them. Dealers would offer bonds for sale in two ways. First, they would list the bonds in *The Blue List of Current Municipal Offerings*. Secondly, they would mail offering circulars to prospective customers. These circulars were customarily prepared and mailed before the bonds were issued.

Taxpayer would retain bonds in its possession until the bidder-dealer effected their disposition to its customers. During this period, usually no longer than thirty days, taxpayer accrued the interest income on the bonds at the coupon rate and credited the interest to a *general account styled "Exempt Interest Earned."* Taxpayer's accounting procedures reflected its possession of the bonds and accrual of interest on the bonds as follows. When taxpayer transmitted to the issuing authority's depositary its cashier's check in payment for an issue, taxpayer's Bond Department would send a charge memo to its cashier which showed a memorandum charge in the amount of the purchase price to the "Refunding Bonds Purchased" account in taxpayer's general ledger. Taxpayer further maintained a subsidiary ledger sheet pertaining to each bond issue. On such a sheet taxpayer would initially

10. At trial taxpayer's president testified that all the bank's loans are evidenced by some kind of debt instrument. He recalled no loan taxpayer made to a dealer during the relevant years which was secured by municipal bonds. He recalled only one loan made to a dealer for the purpose of providing him funds with which to acquire municipals. Taxpayer's statutory loan limit was $450,000 until March 1964, at which time it was increased to approximately $610,000.

Aside from the transactions here in issue, taxpayer, with infrequent exceptions, did not during the years 1962–1964 make advances to or on behalf of anyone that did not maintain a banking relationship with it. Such a borrower was normally required to maintain a compensating balance—generally equaling at least 10 per cent of the loan. Taxpayer would require a compensating balance for the purpose of maintaining sufficient liquidity rather than as a safety measure.

enter the name of the issuer, the name of the successful bidder-dealer, the nature of the bonds, the rate or rates of interest, maturity dates, the first and subsequent coupon dates, and the par value and purchase price of the bonds. As the dealer sold bonds in the issue to the public, its sales would be individually shown on the subsidiary ledger sheet by entries recording the par value of the bonds sold, the dealer's sale price, the par balance remaining, and the book balance remaining. Similar entries recording each sale would be made in the general account. The interest that taxpayer accrued on the bonds would be entered as a debit in the subsidiary ledger, thus increasing the book balance. When coupons were clipped, the collections made thereon would be entered as a credit in the subsidiary ledger, thus decreasing the book balance.

As a dealer found customers for the bonds for which it had bid, it would prepare an invoice made out to the customer and send this invoice to taxpayer. Taxpayer would then send the invoice and the bonds purchased by the customer to the bank at which the customer was to tender payment. It would also instruct the collecting bank to deliver the bonds to the designated purchaser against payment of the dealer's invoice price and to remit or credit the purchase price to taxpayer. Under taxpayer's instructions, interest on bonds was accrued only until the date the sale and purchase was closed. As a result, taxpayer would accrue interest on bonds committed by the dealer for future sale only during the period (a few days) required for completion of the paper work precedent to actual disposition of the bonds. Taxpayer would not accrue interest while the customer's funds were in transit from the collecting bank to taxpayer. With respect to bonds not sold until after the date of their issuance, taxpayer would accrue interest from the date of issuance until disposition of the bonds by the dealer was effected.

With respect to every sale by a dealer to the public of bonds for which the deal-er had bid and taxpayer had paid the issuing authority, taxpayer would send the dealer an invoice showing the bank to which the bonds were sent, the name of the issue, the name of the dealer's customer, the payment date, daily additions for interest, the selling price to the customer, and the name of the dealer. After the customer's payment was transmitted to taxpayer from the collecting bank, taxpayer would enter this payment as a credit reducing the book balance of the particular issue in its subsidiary and general ledgers.

When all the bonds of an issue had been sold by a dealer to its customers, a closing statement would be prepared by taxpayer and furnished to the dealer which reflected the final settlement between them. This statement would show the dealer's gross profit or loss on the issue and include taxpayer's specific charges for insurance, handling, postage, and wires together with the interest accrued since the last monthly accrual date, or since the date of issuance if that was subsequent to the last monthly accrual date. Finally, the statement would show a balance due either the dealer or taxpayer. When a balance was due the dealer, taxpayer, at the dealer's election, would either remit it to the dealer or credit it to the dealer's account with taxpayer, if there was one. When a balance was due taxpayer, the statement would serve as a bill to the dealer.

Computation of the balance due either the dealer or taxpayer was made as follows. To taxpayer the dealer would owe an amount equal to the sum of (1) the book value of the bonds, (2) the accrued interest not reflected on taxpayer's books, (3) taxpayer's handling charge, and (4) taxpayer's wires, postage, and insurance expenses. The term "book value," as used here, means the bid price of the bonds adjusted upward for the interest accrued after the date of issuance and reduced by the interest actually collected by taxpayer. Thus the amount due taxpayer was computable without regard to the relative success or failure of the bond flotation. Taxpayer would

owe the dealer the sum of the payments transmitted by the dealer's customers in return for the bonds. This sum depended entirely upon the public's demand for the bonds. Whether a balance would be due the dealer or taxpayer would also depend entirely upon the price at which the dealer could sell these bonds to the public. The closing statement, therefore, reflected the dealer's degree of success or failure in disposing of bonds for more than the fixed amount it would pay taxpayer.

Throughout the history of taxpayer's business with dealers in connection with new-issue bonds for which the dealers had bid and taxpayer had paid the issuing authority, taxpayer never refused to transfer bonds at the direction of the bidding dealer once the dealer caused taxpayer to be paid the book value of the bonds and taxpayer's handling charge and sales expenses. During the years 1962–1964 no dealer who had successfully bid on bonds for which taxpayer paid the bid price to the issuing authority failed to protect taxpayer against the risk that the bonds could not be sold to the public for at least the value assigned them on taxpayer's books. Indeed, only twice in the history of taxpayer has a dealer failed to cause taxpayer to be paid the book value of bonds for which taxpayer had paid, together with taxpayer's handling charge and incidental expenses.

During the years 1962–1964 taxpayer occasionally arranged for the participation of two other Texas banks in paying to an issuing authority the purchase price of bonds for which a dealer had successfully bid. These banks would either credit taxpayer's accounts with them or remit the price to taxpayer, who would then pay the entire bid price to the issuing authority. Taxpayer would retain in its possession the bonds paid for by the other banks and issue a safekeeping receipt to the other bank or banks participating in the transaction. Such a receipt would show the name of the issue, the interest rate, the maturity date, and the specific bond numbers of the bonds for which the other participating banks advanced payment. As the dealer who had bid for the issue found customers for the bonds covered by the safekeeping receipt, these banks would send an invoice to the dealer, charge taxpayer's account on their books in the amount of the book value of the bonds sold, and instruct taxpayer to deliver the bonds at the dealer's instruction. Like taxpayer, these banks always followed the instructions of the dealer having a customer for bonds for which they had paid the issuing authority.[11]

Since taxpayer is a national banking association, its municipal bond transactions during the years 1962–1964 were subjected to the scrutiny of the Comptroller of the Currency.[12] For years both the Comptroller and the Federal Reserve System Board of Governors had agreed that a transaction in which a bank bought securities under an agreement to resell constituted, for banking regulation purposes, a loan by the bank and a borrowing by the "seller."[13] In 1963, however, the comptroller reversed direction and ruled[14] that such a trans-

11. During the years 1962–1964 the only bonds a national bank could sell subject to a repurchase agreement to another bank were federal government bonds. The banks dealing with taxpayer, however, always honored taxpayer's agreements with the bond dealers.

12. See generally 12 U.S.C. §§ 1, 24, 81–95b (1964), as amended (Supp. IV, 1968).

13. See, e. g., Comptroller's Digest of Opinions ¶ 650(b):

"The purchase of investment securities under resale agreements permitting or requiring the purchasing national bank to sell the securities back to the seller are considered to be loan transactions and must be kept within the limitations provided in [12 U.S.C. § 84] and shown as loans on the books of the bank. * * *"

14. U. S. Dep't of Treasury, Comptroller's Manual for Nat'l Banks ¶ 1131 (1965). See generally Hackley, Our Baffling Banking System, 52 Va.L.Rev. 565, 598–599 (1966).

action did not constitute a loan transaction subjecting a "purchasing" bank to statutory lending limitations[15] and a "selling" bank to statutory borrowing limitations.[16] Instead, the Comptroller determined that such transactions "in form as well as legal effect" were purchases and sales rather than lendings and borrowings.[17] Consequently, the Comptroller viewed taxpayer's "Refunding Bonds Purchased" account as an investment account and its agreements with dealers and other banks in connection with new-issue municipal bonds as sale-repurchase agreements.

In the court below the District Judge heard testimony from two of taxpayer's officers, a vice-president of one of the banks that engaged with taxpayer in transactions of the type here in issue, and officers of three bond dealers with whom taxpayer had dealt. As we construe the District Judge's opinion, the District Judge found, in addition to the stipulated and otherwise undisputed facts, that (1) successful bidders for municipal bonds sold their right to these bonds to taxpayer in exchange for taxpayer's assumption of their obligation to pay the issuing authority for them; (2) dealers were motivated to make these sales because of the "unique service" taxpayer could provide them in the marketing of bonds; (3) these dealers retained options to repurchase the bonds, but were not even tacitly obligated to exercise these options; (4) if dealers failed to exercise their options, taxpayer would absorb any loss or enjoy any gain on the subsequent sale of the bonds; (5) taxpayer entered these transactions to put idle funds to use as short-term investments; (6) that dealers invariably exercised their options to repurchase, even at a loss to themselves, reflected not an obligation to repurchase, but instead

"sound business judgment based on the desire * * * to maintain [their] relationship with [taxpayer]"; (7) the language used by dealers in transacting with taxpayer was "trade language" signifying a sale-repurchase agreement; and (8) taxpayer and the dealers treated these transactions as sale-repurchases rather than as secured-loan transactions. On the basis of these findings, the District Court determined that

> "The rule of law established by court decisions when applied to the facts before this Court can result in no other conclusion than a decision that [taxpayer], in form and substance, was the owner of the municipal obligations and the interest income received by it was interest on the municipal obligations and therefore exempt to it under the provisions of section 103."

296 F.Supp. at 518.

We disagree with the District Court's conclusion for reasons we will point out in detail.

II.

This Court has not previously dealt with the problem of whether a bank paying an issuing authority for municipal bonds awarded to dealers and subsequently sold by these dealers to their customers is for tax purposes to be considered as the owner of the bonds while it holds them or as a secured lender. The decided cases on this question announce various criteria for determining where ownership of the bonds resides in this situation. At most these tests of ownership are helpful, but we decline to regard them as "talismans of magical power," Georgia Southern & F. Ry. Co. v. Atlantic Coast Line R. Co., 5 Cir., 1967, 373 F.2d 493, 498, cert. denied, 389 U.S. 851, 88 S.Ct. 69, 19 L.Ed.2d 120 (1967);

15. 12 U.S.C. § 84 (1964), as amended (Supp. IV, 1968).

16. 12 U.S.C. § 82 (1964), as amended (Supp. IV, 1968).

17. Hearings Before the Subcomm. on Bank Supervision and Insurance of the House Comm. on Banking and Currency and the House Comm. on Banking and Currency on H.R. 107 and H.R. 6885 With Respect to Consolidation of Bank Examining and Supervisory Functions, 89th Cong., 1st Sess. 397 (1965).

accord, Tyler v. Tomlinson, 5 Cir., 1969, 414 F.2d 844, 848, and we consider no single criterion to be controlling. *See* John Kelley Co. v. Commissioner of Internal Revenue, 326 U.S. 521, 530, 698, 66 S.Ct. 299, 304, 90 L.Ed. 278 (1946); Tyler v. Tomlinson, *supra.* Accordingly, we analyze this case in light of the statutory mandate that "Except as otherwise provided * * * gross income means all income from whatever source derived * * *." Int.Rev.Code of 1954, § 61(a).

■■ Regarding the proper scope of our review, taxpayer contends that the question of ownership is one of fact, determined by the trial court in its favor, which should not be set aside unless clearly erroneous. Fed.R.Civ.P. 52(a). We recognize that the characterization of taxpayer's transactions with the dealers and other banks is at least partially a question of fact. Nevertheless,

"* * * [t]he district court's finding on this ultimate issue * * * is not to be garrisoned by the clearly erroneous rule. Though it has factual underpinnings this ultimate issue is inherently a question of law. Obeisance to the clearly erroneous rule must yield when the facts are undisputed and we are called upon to reason and interpret. This is the law obligation of the court as distinguished from its fact finding duties. * * *"

United States v. Winthrop, 5 Cir., 1969, 417 F.2d 905. *See also* Bullock v. Tamiami Trail Tours, Inc., 5 Cir., 1959, 266 F.2d 326, 330; Thomas v. Commissioner of Internal Revenue, 5 Cir., 1958, 254 F.2d 233, 236. Since the basic facts in this case are stipulated or otherwise undisputed, we are obliged to inquire into the ultimate conclusions reached by the District Court.

■ Only persons having the rights and incurring the risks that ownership of municipal bonds entails may treat the interest realized by them on the municipals they own as tax-exempt income under section 103(a) (1). Congress exempted interest on municipals from federal income taxation in part to aid states and their political subdivisions in borrowing from private investors the money needed to finance the business of government. *See, e. g.,* Holley v. United States, 6 Cir., 1942, 124 F.2d 909, 911. Section 103(a) (1) offers taxpayers an incentive to purchase municipals as investments by relieving them of the tax burden that would otherwise be imposed on the return they receive for putting their money to this particular use. *See* Int.Rev.Code of 1954, § 61(a) (4). To protect the revenue against "artful devices," the section 103(a) (1) income exclusion must be narrowly construed, *cf.* Commissioner of Internal Revenue v. P. G. Lake, Inc., 356 U.S. 260, 265, 78 S.Ct. 691, 694, 2 L.Ed.2d 743 (1958), and the substance of transactions rather than the form they take are controlling for federal tax purposes. *Id.* Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935). Therefore, for purposes of section 103(a) (1), ownership must have a genuine basis in reality. *Cf.* Tyler v. Tomlinson, 5 Cir., 1969, 414 F.2d 844, 850.

■ In this case the Commissioner determined that taxpayer never acquired "ownership" of the municipal bonds involved in the transactions in issue. This determination was subject to a presumption of correctness in the court below which taxpayer had the burden of rebutting. *See, e. g.,* Cummings v. Commissioner of Internal Revenue, 5 Cir., 1969, 410 F.2d 675, 679. In light of the well-established principles stated above, we must interpret the undisputed facts here to determine whether taxpayer overcame this presumption.

■ We note first that more than the legal opinions and otherwise self-serving testimony of the trial court witnesses about their past intention to transfer "ownership" is required under the circumstances here to rebut the presumption that the Commissioner's determination was correct. *Cf.* United States v. Smith, 5 Cir., 1969, 418 F.2d 589. Even if we were to accept the opinion testimony at face value, we would nev-

ertheless be obliged to determine " * * whether the intent and acts of these parties should be disregarded in characterizing [their] transaction[s] for federal tax purposes." United States v. Snyder Brothers Company, 5 Cir., 1966, 367 F. 2d 980, 982–983, *cert. denied,* 386 U.S. 956, 87 S.Ct. 1021, 18 L.Ed.2d 104 (1967), *citing* Kraft Foods Company v. Commissioner of Internal Revenue, 2 Cir., 1956, 232 F.2d 118, 123. Similarly, that the Comptroller of the Currency has placed his imprimatur on the denomination of these transactions as sale-repurchases for banking regulation purposes is not conclusive that they were sale-repurchases for tax purposes.

██ The substance of the new-issue transactions involved in this case we find to have been as follows: (1) the successful bidder-dealer for a new issue was entitled to delivery of the bonds upon payment of the bid price; (2) if payment was not made to the issuing authority according to the terms of sale, the dealer's good-faith deposit with the authority was subject to forfeiture; (3) the dealer, however, was not required to produce the purchase price of bonds coming into its inventory until after it had acquired funds received in payment for these bonds from its customers, because taxpayer paid the dealer's bid price to the issuing authority and retained the bonds, already in its possession at the direction of the issuing authority, until payment was transmitted from the dealer's customers; (4) taxpayer collected for itself the interest accruing on the bonds while it held them; (5) the dealer, regardless of whether it profited or lost upon sales to its customers, invariably caused taxpayer to be paid the bid price of the issue (a bid in which taxpayer played no part as to the purchase price the dealer agreed to pay if his bid was successful), adjusted for interest, and its handling charge and incidental expenses. As a result of transactions of this type, the distribution of new issues to the public was facilitated by means of the use of taxpayer's funds and the dealers' sell-

ing efforts. Taxpayer looked solely to the interest accruing on the bonds for its profit. The dealers profited if they could sell the bonds for more than their adjusted bids, but bore the risk that the bonds could not be sold for at least that much. In short, taxpayer was in effect a lender secured by collateral in its possession. Under these circumstances, we would be blinding ourselves to reality if we did not see quite clearly that taxpayer's role here was that of a lending institution, making its funds available to bond dealers who bid successfully on new issues, retaining the bonds as collateral until the dealers had disposed of them to customers and reimbursed the bank, incurring no profits or risks due to market fluctuations, and being paid interest only for advance of its funds. We cannot indulge the fiction that the bank was the actual owner of the bonds under the undisputed facts, even if the parties to the transactions wish to term it so. How there could be a sale-repurchase transaction betweeen the bank and a dealer when ordinarily a substantial portion of each bond issue was sold to the dealer's customers before the bonds were issued, and possession obtained by taxpayer, is hard to understand. Certainly the bank did not intervene as a "purchaser" of these bonds. The dealer exercised complete dominion over the bonds after they came into the bank's possession. He sold them at his pleasure, at prices he determined, and without reference to the bank, except that the proceeds were collected from the customer by the bank and applied to the dealer's account. Obviously the inventory of bonds was being held by the bank for the dealers and subject to their disposition. To us the bank was simply a lender of its funds to the dealers. For this service it was paid interest by the borrowing dealers. Taxpayer took only the risks of a lender in these transactions. We must, therefore, look beyond the forms and terms which the bank and the dealers attributed to these dealings to the real substance thereof. When we do, the conclusion is inescapable that taxpayer was not en-

titled to the section 103(a) (1) income exclusion.

The only real risk that taxpayer incurred during the course of its transactions with the bond dealers was that the successful bidder for high-grade ("BAA" or above) bonds would, in a falling market, be either financially unable to take the bonds from taxpayer or be indifferent to the consequences of not taking them. Taxpayer enjoys a position of predominance in the distribution of municipal bond issues in Texas. Its refusal to provide its unique services to a bond dealer would bode ill for that dealer's business in the Texas bond market. The record shows clearly that dealers, so long as they desired to continue marketing new issues of Texas municipal bonds, insulated taxpayer from market fluctuations in the price of bonds that taxpayer held. The testimony of taxpayer's own witnesses establishes that bond dealers understood that taxpayer's continued participation with dealers in new-issue transactions depended upon the continued protection of taxpayer from the risk of loss in a falling market. Thus the basic risk of ownership of the bonds was incurred by the dealers.

The District Court considered two appellate decisions involving the tax effect of transactions between banks and bond dealers of the general type here in issue and concluded that one, Commissioner of Internal Revenue v. Bank of California, Nat. Ass'n, 9 Cir., 1935, 80 F.2d 389, aff'g B.T.A., 1934, 30 B.T.A. 556, was conclusive of this case, while the other, First Nat. Bank in Wichita v. Commissioner of Internal Revenue, 10 Cir., 1932, 57 F.2d 7, aff'g B.T.A., 1930, 19 B.T.A. 744, was distinguishable. Unlike the District Court, we discern no rule of

law in these cases which is controlling here.[18]

In *First Nat. Bank in Wichita* the Board of Tax Appeals formulated the question for decision as follows:

"The question here, as we view it, is not dependent upon who held the bare legal title to the bonds during the dates of sale and repurchase, but rather upon the broader issue as to whom, under the understanding between the bank and its customers, was entitled to receive, and who, as carried out, did receive the interest payments made by the issuing authorities of such bonds when collected and paid. * * * *"

19 B.T.A. at 749. In *Bank of California* the Board also relied upon the manner in which the bank and the bond dealers treated the bond interest as support for its conclusion that the bank "owned" the bonds. 30 B.T.A. at 561. In our view, in the cited cases the Board placed undue emphasis on the intent and acts of the parties. As we said in United States v. Snyder Brothers Company, 5 Cir., 1966, 367 F.2d 980, 982–983, the question with which courts must be concerned in cases such as this is whether the intent and acts of the parties should be disregarded in characterizing their transactions for tax purposes. Under the circumstances here, taxpayer's "ownership" of these bonds was without substance; therefore, it was not entitled to treat bond interest earned as tax-exempt income.

To summarize, we hold that taxpayer failed to establish in the court below that it was entitled to treat the income received by it in the form of interest it collected on municipal bonds as excludable from its gross income under section 103(a) (1) of the Internal Revenue Code of 1954. Section 103(a) (1) requires

18. Both *Bank of California*, decided in favor of the taxpayer, and *First Nat. Bank in Wichita*, decided in favor of the Commissioner, were initially determined by the Board of Tax Appeals, an administrative board whose findings of fact were conclusive upon appellate courts at that time, "if the evidence was legally sufficient to sustain them and there was no irregularity in the proceedings." Phillips v. Commissioner of Internal Revenue, 283 U.S. 589, 600, 51 S.Ct. 608, 613, 75 L.Ed. 1289 (1931). *See also* Revenue Act of 1926, § 1003 (b), 44 Stat. 110; Revenue Act of 1924, § 900(g), 43 Stat. 253. Because judicial review of Board decisions was so circumscribed, we attach little significance to the action of the Circuit Courts in affirming the Board in these cases.

that "ownership" have a genuine basis in reality which is absent here when all the facts and circumstances are carefully examined. Accordingly, the judgment of the District Court is reversed. Since the District Judge did not consider taxpayer's claim for the allowance of an addition to its reserve for bad debts, the case is remanded for a ruling on this issue.

Reversed and remanded.