AMERICAN NATIONAL BANK
OF AUSTIN

v.

The UNITED STATES.

AMERICAN NATIONAL BANK OF
AUSTIN and Federated Capital
Corporation

v.

The UNITED STATES.

Nos. 318-74 and 124-75.

United States Court of Claims.

March 22, 1978.

Buford P. Berry, Dallas, Tex., for plaintiffs; J. W. Bullion, attorney of record; Thompson, Knight, Simmons & Bullion, Dallas, Tex., of counsel.

Robert N. Dorosin, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant; Theodore D. Peyser, Washington, D. C., of counsel.

Before COWEN, Senior Judge, and KASHIWA and BENNETT, Judges.

## OPINION

PER CURIAM:

These cases come before the court on defendant's exceptions to the recommended decision of Senior Trial Judge Mastin G. White, filed March 31, 1977, pursuant to

Rule 134(h), having been submitted on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth,* it hereby affirms and adopts the said decision as the basis for its judgment in these cases. It is, therefore, concluded that plaintiffs are entitled to recover, together with interest as prescribed by statute, and judgment is entered for plaintiffs to that effect with the amount of recovery to be determined pursuant to Rule 131(c).

## OPINION OF TRIAL JUDGE

WHITE, Senior Trial Judge: The question to be decided in these consolidated cases is whether income that was received during the 1965–70 period by the American National Bank of Austin ("the plaintiff"[1]) in the form of coupon interest on municipal bonds which the plaintiff held—but which, while being held by the plaintiff, were subject to the rights of various bond dealers to acquire the bonds from the plaintiff upon paying the plaintiff amounts previously agreed upon—constituted tax-exempt income to the plaintiff (as contended by the plaintiff) or taxable income (as contended by the defendant).

The pertinent statutory provision is section 103(a)(1) of the Internal Revenue Code of 1954 (26 U.S.C. § 103(a)(1)), which declares in part that, for income tax purposes, gross income does not include interest on the obligations of any political subdivision of a State. Thus, the answer to the question outlined in the first paragraph of this opinion depends upon whether the transactions between the plaintiff and the various bond dealers should properly be characterized as purchases of bonds by the plaintiff, subject to options by the respective dealers to acquire the bonds from the plaintiff—so that the plaintiff was both the legal and the beneficial owner of the bonds pending the exercise of the options by the dealers—or whether such transactions should properly be characterized as loans made by the plaintiff to the bond dealers on the security of the bonds in question.

The plaintiff is a national banking association, and has its place of business in Austin, Texas. Along with its other activities, the plaintiff became active sometime during the late 1930's in the handling of bonds issued by municipalities and other political subdivisions of the State of Texas. The plaintiff's business in municipal bonds was greatly facilitated by its location in Austin, which is the state capital of Texas and the place where all bonds issued by political subdivisions of the State of Texas must be examined, certified, approved, and registered. Also, the plaintiff was very vigorous in pursuing this line of endeavor. The result was that, from a modest beginning in the 1930's, the plaintiff ultimately came to occupy a paramount position in the municipal bond business within the State of Texas, with every municipal bond dealer in the State of Texas doing business with the plaintiff from time to time. During the 1965–70 period that is involved in the present litigation, the plaintiff participated in transactions involving (numerically) from 50 to 80 percent of all bond issues floated by political subdivisions of the State of Texas.

For a proper understanding of the transactions between the plaintiff and bond dealers that provide the basis for the present litigation, it is necessary to outline in some detail the procedures involved in the issuance of bonds by political subdivisions of the State of Texas.

The first step is the publication by the issuing authority of an official notice of sale. This notice sets forth (among other things) the amount of the bond issue, the

---

* The dissenting opinion of Judge Kashiwa follows the opinion of the trial judge which has been adopted by the court.

1. The Federated Capital Corporation is named as a plaintiff in case No. 124–75 because it is considered to occupy the role of a successor parent corporation for some of the later years in question. The American National Bank of Austin was directly involved in all of the transactions that are before the court in the two cases.

issue date (*i. e.*, the date from which accrued interest on the bonds will run), the maturity dates, the required good-faith deposit (it is generally equal to 2 percent of the par value of the bonds), the place of delivery, and the anticipated delivery date (it is generally about 45 days after the bids are to be opened and the bond issue awarded to the successful bidder-dealer).

With minor exceptions, the place of delivery for bonds issued by Texas political subdivisions is Austin, Texas; and, as a general rule during the years involved in this litigation, the plaintiff's banking house was designated in official notices of bond sales as the specific place of delivery.

When the plaintiff's banking house was designated in an official notice of sale as the place of delivery for a new issue of Texas municipal bonds, the next step involving the plaintiff was a letter from the issuing authority to the plaintiff, advising the plaintiff of the identity of the successful bidder-dealer and authorizing the plaintiff to deliver the bonds to such dealer against the payment of a specified purchase price. The plaintiff would also receive a letter from the depository bank for the issuing authority respecting the transmittal of the proceeds of the sale of the bonds to the depository bank, for the credit of the issuing authority.

After the bonds were printed, they were sent to the office of the Attorney General of Texas, and then to the office of the State Comptroller of Public Accounts. In the State of Texas, every municipal bond issue has to be examined, certified as to validity, and approved by the Attorney General, and the bonds also have to be registered by the Comptroller of Public Accounts and signed manually by the Comptroller or his authorized representative. When these requirements were satisfied, the bonds were delivered to the plaintiff, who thereupon performed numerous functions on behalf of both the issuing authority and the successful bidder-dealer, and for which the plaintiff was entitled to receive from the bond dealer a handling charge of 25 cents per $1,000 of par value of the bonds, plus reimbursement for expenses incurred by the plaintiff.

As indicated previously, the plaintiff was authorized by the issuing authority to deliver the bonds to the successful bidder-dealer upon payment of the amount bid by the dealer for the bonds, plus an amount representing the coupon interest (if any) on the bonds that had accrued between the date of issue and the date of delivery. The transactions between the plaintiff and bidder-dealers that are involved in the present litigation arose because bidder-dealers, upon being notified that they had been awarded particular bond issues, would often approach the plaintiff—usually by telephone—and inquire concerning the plaintiff's willingness to "take up" the bonds. In a situation typical of those that are involved in the present litigation, a bidder-dealer would call the plaintiff on the telephone and say that he had submitted the best bid on a certain bond issue, and that he would like for the plaintiff to "take up" the bonds, pending his sale of the securities to his customers. If the plaintiff, after having considered the issuing authority's credit standing, regarded the bond issue as financially sound, the plaintiff would orally agree to "take up" the bonds. Such an oral agreement was sometimes confirmed by means of a letter, but in most instances there was no written confirmation of the agreement.

As a matter of trade practice, both the plaintiff and Texas bond dealers had a common understanding as to what would be involved if the plaintiff agreed to "take up" a bond issue at the request of a successful bidder-dealer. Accordingly, an agreement—whether oral only or confirmed in writing—between the plaintiff and a successful bidder-dealer that the plaintiff would "take up" a bond issue at the request of the dealer was mutually understood by the plaintiff and the dealer to mean:

(1) That when the bonds were delivered to the plaintiff (in accordance with the official notice of sale, and after having been approved by the State Attorney General and registered by the State Comptroller),

the plaintiff, using its own funds for the purpose, would remit to the issuing authority (through the latter's depository bank) the amount of the bid price, plus an amount representing the coupon interest (if any) that had accrued on the bonds between the date of issue and the date of delivery to the plaintiff.

(2) That the plaintiff, upon paying the issuing authority for the bonds, would become the owner of the bonds, subject to the option mentioned in paragraph (3), and could collect any coupon interest that might become due on the bonds while they were held by the plaintiff.

(3) That the bond dealer would have an option of indefinite duration to acquire the bonds from the plaintiff at the same price which the dealer had originally bid on the bonds (and which the plaintiff was to pay the issuing authority for the bonds), plus a handling charge of 25 cents per $1,000 of par value of the bonds, plus an amount representing the coupon interest on the bonds accruing between the date of issue and the date of the exercise of the option (and not theretofore collected by the plaintiff), plus reimbursement for expenses incurred by the plaintiff.

(4) That the bond dealer, having the option mentioned in paragraph (3), would be completely free to proceed with prompt and vigorous attempts to make sales of the bonds to his customers at whatever prices the bonds could be sold for, and that the plaintiff would not have any supervision or control over the dealer's sales efforts.

(5) That as the dealer sold the bonds to his customers from time to time, he would furnish the pertinent information to the plaintiff (usually over the telephone, followed by the submission of the appropriate invoices), whereupon the plaintiff would deliver the bonds to the purchasers in accordance with the dealer's instructions.

(6) That the plaintiff, in connection with the delivery of bonds to the dealer's customers pursuant to the dealer's instructions, would collect the dealer's sales prices from the customers; and that if, upon the disposition of the entire bond issue, the total of the dealer's sales prices exceeded the option price mentioned in paragraph (3), the plaintiff would remit the difference to the dealer; but that if the total of the dealer's sales prices was less than the option price, the dealer would reimburse the plaintiff for the deficit.

When a bond dealer was awarded a bond issue by an issuing authority and obtained from the plaintiff an agreement that the plaintiff would "take up" the bond issue, the dealer began at once a vigorous sales campaign to sell the bonds to his customers for future delivery; and ordinarily he sold a substantial portion of the issue for future delivery before the bonds were actually delivered to the plaintiff in accordance with the official notice of sale. With respect to those bonds which the dealer was able to sell before the bond issue was delivered to the plaintiff, the plaintiff, upon taking delivery, would then make delivery to the dealer's customers in accordance with the dealer's instructions. The bond dealer would continue to market the remainder of the bonds to the public after they were delivered to the plaintiff; and, as sales were made, the plaintiff would effect delivery of the bonds to the dealer's customers in accordance with the dealer's instructions. In effecting deliveries, the plaintiff would collect the dealer's sales prices from the purchasers of the bonds.

As a general rule, an entire bond issue would be disposed of within a maximum period of about 30 days after the delivery of the issue to the plaintiff. The plaintiff and the bond dealer would then have a final settlement in accordance with their agreement, as previously outlined. If the total of the dealer's sales prices exceeded the option price at which the dealer was entitled to acquire the bonds from the plaintiff, the plaintiff would remit the difference to the dealer. On the other hand, if the total of the dealer's sales prices was less than the option price, the dealer would reimburse the plaintiff for the deficit.

Up until April of 1970, bond dealers for whom the plaintiff had "taken up" bond issues invariably exercised their options to

acquire all such bonds from the plaintiff. This was so even in those instances where the market was such that the dealers were compelled to sell particular bond issues to the public at prices that were lower than the option prices under their respective agreements with the plaintiff. Dealers seemingly felt a moral obligation to protect the plaintiff by exercising their options even though losses to the dealers were involved. Also, because of the paramount position of the plaintiff in the municipal bond business within the State of Texas, and the services which the plaintiff was prepared to and did render to bond dealers, it was important for dealers to maintain the friendship and goodwill of the plaintiff.

In April of 1970, however, the plaintiff's Board of Directors decided that the plaintiff would discontinue the business of "taking up" bond issues for successful bidder-dealers. This decision was made following the decision of the United States Court of Appeals for the Fifth Circuit in the case of *American National Bank of Austin v. United States*, 421 F.2d 442 (5th Cir. 1970), *cert. denied*, 400 U.S. 819, 91 S.Ct. 36, 27 L.Ed.2d 46 (1970), to the effect that the transactions between the plaintiff and successful bidder-dealers during the years 1962–64 constituted secured loans and, accordingly, that the interest income received by the plaintiff from such transactions was not tax-exempt to the plaintiff.

Following the determination by the plaintiff's Board of Directors mentioned in the preceding paragraph, the plaintiff informed all bond dealers in the area that the plaintiff was terminating the business of "taking up" bond issues at the request of successful bidder-dealers, and that all existing options of bidder-dealers to acquire from the plaintiff bonds which the plaintiff had "taken up" pursuant to their requests must be exercised on or before May 1, 1970, or would terminate.

After receiving such notification from the plaintiff, bond dealers exercised their options to acquire from the plaintiff all bonds for which the then-existing market prices were in excess of the option prices.

However, six bond dealers failed and, when requested by the plaintiff to do so, declined to exercise their options with respect to bonds for which the then-existing market prices were less than the option prices. The option prices on the bonds with respect to which the six bond dealers declined to exercise their options aggregated approximately $800,000 to $900,000. The plaintiff subsequently sustained a loss of more than $160,-000 on one group of these bonds.

The plaintiff consulted with its attorney sometime in May of 1970 to determine whether it had any legal recourse against the six bond dealers who declined to exercise their options. The plaintiff was advised by its counsel that no action could be taken in this matter because the dealers were not subject to any legally enforceable obligation to acquire the bonds from the plaintiff.

During the years in question, 1965–70, the plaintiff in its federal income tax returns excluded from its gross income the income which it received in the form of coupon interest collected or accrued on municipal bonds in its possession as a result of having "taken up" bond issues at the request of successful bidder-dealers. The Internal Revenue Service, however, determined that such interest was in reality taxable income received by the plaintiff from the bond dealers for financing their acquisitions of bonds. Such determination was the basis for deficiency assessments, which the plaintiff paid and which gave rise to the present litigation.

Certainly as to form, the transactions in which municipal bonds were "taken up" by the plaintiff at the request of successful bidder-dealers amounted to purchases of the bonds by the plaintiff, subject to options by the dealers to acquire the bonds subsequently from the plaintiff, rather than loans by the plaintiff to the bidder-dealers on the security of the bonds. This is shown by the circumstances that:

(1) In deciding whether to "take up" bond issues at the request of successful bidder-dealers, the plaintiff relied on the credit standing of the political subdivisions

issuing the bonds, and did not rely to any extent on the credit standing of the bidder-dealers making the requests.

(2) The plaintiff treated the bonds as investment assets on its books and records.

(3) Bank examiners, in examining the plaintiff's books and records, treated the bonds as investment assets of the plaintiff.

(4) The bond dealers did not treat the bonds as assets on their financial statements.

(5) The only interest that the plaintiff ever received was the coupon interest on the bonds at the coupon rate. No interest payments were ever received by the plaintiff from bond dealers in connection with these transactions.

(6) Bidder-dealers did not execute notes or other debt instruments in connection with these transactions, whereas the plaintiff could not legally make loans unless they were evidenced by notes or other debt instruments.

(7) Bidder-dealers for whom the plaintiff agreed to "take up" bond issues were not required to maintain any sort of banking relationship with the plaintiff, whereas persons to whom the plaintiff made loans were required to maintain banking relationships with the plaintiff.

However, the United States Court of Appeals for the Fifth Circuit held in the earlier case of *American National Bank of Austin v. United States*, previously cited, that the transactions between the plaintiff and successful bidder-dealers during the 1962–64 period made the bank, in substance, "simply a lender of its funds to the dealers," for which service the plaintiff "was paid [taxable] interest by the borrowing dealers" (421 F.2d at 452). In this connection, the defendant argues that the plaintiff is collaterally estopped from litigating in these cases the taxability of the coupon interest which the plaintiff received during the 1965–70 period on bonds which it had "taken up" for successful bidder-dealers.

■ The doctrine of collateral estoppel applies only "where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged." *Commissioner v. Sunnen*, 333 U.S. 591, 599–600, 68 S.Ct. 715, 720, 92 L.Ed. 898 (1948). Furthermore, even in a situation where the relevant facts in an earlier case and those in a later case are similar or identical, "if the relevant facts in the two cases are separable, * * * collateral estoppel does not govern the legal issues which recur in the second case." *Id.* at 601, 68 S.Ct. at 721.

■ The two companion cases now before this court not only involve taxable years different from those that were involved in the earlier *American National Bank of Austin* case, and involve transactions between the plaintiff and bond dealers different from the transactions that were involved in the earlier case, but we have here an additional circumstance of considerable significance that did not appear in the earlier case.

The evidence in the earlier *American National Bank of Austin* case showed that during the years involved in that case (1962–64), no successful bidder-dealer, at whose request the plaintiff had paid an issuing authority for a bond issue, subsequently failed to acquire the bonds from the plaintiff. On the basis of such evidence, the court in the earlier case said (421 F.2d at 452):

> * * * The dealers profited if they could sell the bonds for more than their adjusted bids, but *bore the risk* that the bonds could not be sold for at least that much. In short, taxpayer was in effect a lender secured by collateral in its possession. Under these circumstances, we would be blinding ourselves to reality if we did not see quite clearly that taxpayer's role here was that of a lending institution, making its funds available to bond dealers who bid successfully on new issues, retaining the bonds as collateral until the dealers had disposed of them to customers and reimbursed the bank, *incurring no * * * risks* due to market fluctuations, and being paid interest only

for advance of its funds. \* \* \* [Emphasis supplied.]

Although the court in the earlier case referred (421 F.2d at 453) to the possibility that a successful bidder-dealer might, "in a falling market, be either financially unable to take the bonds from taxpayer or be indifferent to the consequences of not taking them," the court discounted such possibility and concluded that "the basic *risk* of ownership of the bonds was incurred by the dealers" (emphasis supplied).

Thus, it was the supposed lack of risk on the part of the plaintiff that led the Court of Appeals in the first *American National Bank of Austin* case to conclude that, in substance, the transactions between the plaintiff and successful bidder-dealers during the 1962–64 period were loan transactions.[2] On the other hand, the evidence in our present record shows that, when the crunch finally came and the matter was put to the test, the plaintiff actually bore the "basic risk of ownership of the bonds." According to the evidence in this record, six bond dealers declined to exercise their options, the plaintiff had no legal recourse against them, and, as a consequence, the plaintiff sustained a large financial loss.

It is concluded, therefore, that the doctrine of collateral estoppel is not applicable to the present litigation, that the decision of the Court of Appeals in the first *American National Bank of Austin* case should not control the outcome of the present cases, and that the transactions between the plaintiff and successful bidder-dealers during the 1965–70 period involved, in substance as well as in form, purchases of municipal bonds by the plaintiff, subject to options on the part of the bond dealers to acquire the bonds from the plaintiff.

█ It necessarily follows that the coupon interest which the plaintiff received as the owner of the municipal bonds in its possession constituted tax-exempt income to the plaintiff under section 103(a)(1) of the 1954 Code.

Accordingly, the plaintiffs are entitled to recover in the two cases that are before the court. The amount of the recovery will be determined in accordance with Rule 131(c).

## FINDINGS OF FACT

1. (a) Plaintiff American National Bank of Austin is a national banking association and has its place of business in Austin, Texas. During the years in question, 1965 through 1970, plaintiff American National Bank of Austin timely filed its income tax returns with the District Director of Internal Revenue at Austin, Texas.

(b) All of the transactions in issue transpired within plaintiff American National Bank of Austin. Federated Capital Corporation is a named plaintiff because it is considered the successor common parent corporation to the consolidated group for some of the later years in question.

(c) The term "plaintiff," when used hereafter in the findings, will refer to plaintiff American National Bank of Austin, unless the context plainly indicates otherwise.

2. Claims for refund were timely filed which set forth the approximate amount of income tax and assessed interest that are sought to be recovered, such amounts being as follows:

| Year | Income Tax | Assessed Interest |
| --- | --- | --- |
| 1965 | $287,002.35 | $102,216.08 |
| 1966 | 315,598.13 | 93,464.60 |
| 1967 | 288,609.46 | 80,135.32 |
| 1968 | 369,655.90 | 77,992.33 |
| 1969 | 348,459.28 | 52,612.48 |
| 1970 | 60,977.00 | 5,548.07 |

3. (a) Plaintiff's municipal bond business began in the late 1930's, at a time when many Texas municipalities were recovering from the depression. Many of these municipalities then had outstanding bond issues which they desired to refund with new bond issues in order to provide for lower interest rates, longer maturities, and more favorable repayment schedules. Under the Texas law at that time, a municipality could not refund its outstanding bonds

---

2. Cf. *Union Planters National Bank of Memphis v. United States*, 426 F.2d 115 (6th Cir. 1970);

*First American National Bank of Nashville v. United States*, 467 F.2d 1098 (6th Cir. 1972).

into new bonds unless it refunded an entire issue. As a prerequisite to refunding, someone—a single concern or syndicate, for example—had to acquire all bonds in an issue. Plaintiff, at this early time, began to acquire municipal bonds which issuing municipalities wanted to refund.

(b) Plaintiff's business in municipal bonds was greatly facilitated by its location in Austin, the state capital of Texas, where every municipal bond issued by political subdivisions of the State of Texas must be examined, certified, approved, and registered.

4. When plaintiff commenced to obtain municipal bonds to be refunded, it opened in its general ledger an account styled "Refunding Bonds Purchased." This account was an asset account; and a balance was struck each day showing the book balance of the bonds on hand at the end of the day. Although in recent years there has been little refunding, the account continued to bear the same name; and into that account were entered all Texas municipal bonds which have come into the possession of the plaintiff as a result of the transactions in issue in the prior case of *American National Bank of Austin v. United States*, 421 F.2d 442 (5th Cir. 1970), *cert. denied*, 400 U.S. 819, 91 S.Ct. 36, 27 L.Ed.2d 46 (1970), for the years 1962 through 1964, and the transactions in question in the two consolidated cases at bar for the years 1965 through 1970.

5. (a) From a modest beginning in the refunding bond business, plaintiff vigorously pursued its municipal bond activities; and during the years in question, it participated in transactions involving (numerically, not dollar volume) from 50 percent to 80 percent of all bond issues floated by political subdivisions of the State of Texas.

(b) The plaintiff occupied a paramount position in the State of Texas in connection with its municipal bond business. Every municipal bond dealer in the State of Texas did business with it. Rauscher Pierce Security Corporation, the largest volume dealer of municipal bonds in the State of Texas, did practically all of its municipal bond business in the primary market with the plaintiff. Almon and Company, another well-regarded municipal bond firm, did between 30 and 50 percent of its municipal bond business with the plaintiff.

6. (a) The distribution of a new issue of municipal bonds in Texas commences when the issuing authority publishes the official notice of sale. This notice, among other things, sets forth the amount of the issue, the maturity dates, the types of bids and interest rates, requirements as to the good-faith deposit, the nature of the legal opinion pertaining to the issue, and the place of delivery. Pursuant to this notice, bond dealers submit bids to the issuing authority.

(b) In deciding whether to submit bids to the issuing municipality, bond dealers consider the bidding specifications, the credit standing of the municipality from the various market rating services, the current status of the debt of the issuing municipality, the general market conditions in the municipal bond business, their customer interest in the particular bond issue, and their ability to profitably underwrite and distribute the entire bond issue to the public. The most significant criterion is the ability of the bond dealer to sell the bond issue for an overall profit.

(c) As evidence of the bidder's good faith, the issuing authority in its official notice of sale requires that each bidder-dealer submit with its bid a "good faith deposit" in the form of a check payable to the issuer and generally equal to 2 percent of the par value of the bonds. The check of the successful bidder-dealer is held by the issuing authority to assure performance under the contract, and is then returned to the successful bidder-dealer upon delivery and payment for the bonds. The good-faith deposit would be retained by the issuing authority as complete liquidated damages in the event of a failure or refusal by the successful bidder-dealer to pay the award price, plus accrued interest (if any), of the entire bond issue.

(d) The official notice of sale published by the issuing authority will set forth the issue date of the bonds. This is the date

from which accrued interest will run on the bonds. In contrast, the delivery date of the bonds refers to the date when the entire bond issue is delivered to the purchaser, who remits the award price, plus accrued interest (if any), to the depository bank of the issuing authority. As a general rule, during the years in question, bonds were actually delivered by the issuing authority about 45 days after the date of the award of the entire bond issue by the issuing municipality to the successful bidder-dealer. The official notice of sale would generally estimate the anticipated delivery date of the bonds.

(e) The issuing authority generally executed the acceptance clause on the bid form of the successful bidder-dealer and returned it to the successful bidder-dealer. The successful bidder-dealer was subsequently notified when the bonds were ready for delivery by a telephone call or a letter, either from the attorney for the issuing authority or its financial adviser. The representative for the issuing authority would typically inform the successful bidder-dealer that the bonds would be ready for delivery in about 5 business days or 7 calendar days. At that time, on the delivery of the bonds, the successful bidder-dealer's award price for the entire bond issue, plus accrued interest (if any), would have to be paid to the issuing municipality.

7. In the Texas Bond Reporter, the Municipal Advisory Council of Texas publishes, among other things, official notices of bond sales. It also indicates the place of delivery of the bonds. With minor exceptions, the bonds are delivered at Austin, Texas, and, as a general rule during the years in issue, the bonds were delivered at the plaintiff's banking house.

8. When plaintiff's banking house was designated as the place of delivery for a particular new issue of Texas municipal bonds, the next step was a letter from the issuing authority advising plaintiff of the successful bidder-dealer and authorizing plaintiff to deliver the bonds to the bidder-dealer against payment of a specified purchase price. Plaintiff would also receive a letter from the depository bank for the issuing authority respecting transmittal of the proceeds of the sale of the bonds to the depository bank for the credit of the issuing authority.

9. After the bonds were printed, they were sent to the Attorney General and the Comptroller of Public Accounts. In the State of Texas, every municipal bond issue has to be examined, certified as to validity, and approved by the Attorney General, and also has to be registered by the Comptroller of Public Accounts and signed manually by the Comptroller or his authorized representative.

10. (a) When the preceding requirements were satisfied, the bonds were delivered to the plaintiff. At this point, plaintiff performed numerous functions on behalf of both the issuing authority and the bidder-dealer. It examined the bonds for printing errors and determined that the correct number of coupons were attached. The first bond of the issue was sent to the approving attorney, who, after examination of the bond, issued an opinion as to the validity of the bond. This opinion was then sent to plaintiff. Plaintiff also received from a representative of the issuing authority a no-litigation certificate with respect to the municipal bond issue. It also received from the issuing authority, in a fiduciary capacity, an undated receipt for payment of the funds to the issuing authority by the successful bidder-dealer.

(b) The issuing authority, in its letter to the plaintiff, authorized the plaintiff, as its fiduciary agent, to first hold and then date the signed but undated copies of the treasurer's receipt and the no-litigation certificate concurrently with the date of delivery of and payment for the bonds. The issuing authority further directed the plaintiff to forward all copies of the treasurer's receipt and the no-litigation certificate to the attorneys for the issuer.

(c) When all required documents were collected and the bidder-dealer paid plaintiff the purchase price, plaintiff transmitted the funds to the issuing authority's depository bank and delivered the bonds to

the bidder-dealer. For providing the services previously mentioned, plaintiff received a handling charge from the bond dealer of 25 cents per $1,000 of par value, plus expenses incurred (such as insurance, postage, and wires).

11. The transactions where the purchase price of the bonds was paid with funds supplied by the successful bidder-dealers are not in issue. Only transactions in which the purchase price of the bonds was paid by plaintiff with its own funds are in issue in this case.

12. (a) Where the plaintiff paid with its own funds the purchase or award price of the entire bond issue bid in by the successful bidder-dealer, the plaintiff retained possession of the bonds. These bonds were already in its possession at the prior direction of the issuing authority. Plaintiff transmitted its own funds to the depository bank of the issuing authority in payment for the purchase price of the bonds bid in by the successful bidder-dealer, only pursuant to the authorization of the successful bidder-dealer.

(b) No funds were obtained from the bond dealer. Plaintiff sent its own funds to the depository bank of the issuing authority.

13. (a) During the years in issue, plaintiff acquired entire new issues of bonds and bonds that had already been issued. Plaintiff acquired bonds that had already been issued in two ways. Plaintiff either acquired from a dealer bonds which he held in his inventory, or plaintiff acquired bonds which a purchasing dealer had either bought or obligated himself to buy from a selling dealer.

(b) Approximately 90 percent of the dollar volume of the bonds plaintiff acquired were new issues.

(c) In all of the transactions in question where the plaintiff used its own funds to pay either the bid price of the bonds in the primary market or the cost of the bonds to the dealer in the secondary market, the plaintiff took or retained possession of the bonds until the dealers had consummated sales of such bonds to their customers. Plaintiff entered the acquisitions in the account styled "Refunding Bonds Purchased."

14. (a) The transactions between the plaintiff and successful bidder-dealers on new issues of municipal bonds that are involved in the present litigation arose because bidder-dealers, upon being notified that they had been awarded particular bond issues, would often approach the plaintiff— usually by telephone—and inquire concerning the plaintiff's willingness to "take up" the bonds.

(b) In a situation typical of those that are involved in the present litigation, a bidder-dealer would call the plaintiff on a telephone and say that he had submitted the best bid on a certain bond issue, and that he would like for the plaintiff to "take up" the bonds, pending his sale of the securities to his customers. If the plaintiff, after having considered the issuing authority's credit standing, regarded the bond issue as financially sound, the plaintiff would orally agree to "take up" the bonds. Such an oral agreement was sometimes confirmed by means of a letter, but in most instances there was no written confirmation of the agreement.

(c) As a matter of trade practice, both the plaintiff and the bond dealers had a common understanding as to what would be involved if the plaintiff agreed to "take up" a bond issue at the request of a successful bidder-dealer.

(d) An agreement between the plaintiff and a successful bidder-dealer that the plaintiff would "take up" a bond issue at the request of the dealer was mutually understood by the plaintiff and the dealer to mean:

(1) That when the bonds were delivered to the plaintiff (in accordance with the official notice of sale, and after having been approved by the Attorney General and registered by the Comptroller), the plaintiff, using its own funds for the purpose, would remit to the issuing authority (through the latter's depository bank) the amount of the bid price, plus an amount representing the

coupon interest (if any) that had accrued on the bonds between the date of issue and the date of delivery to the plaintiff.

(2) That the plaintiff, upon paying the issuing authority for the bonds, would become the owner of the bonds, that such ownership would be subject to the option mentioned in subparagraph (3) of this paragraph (d), and that the plaintiff could collect any coupon interest that might become due on the bonds while they were held by the plaintiff pending the exercise of the dealer's option.

(3) That the bond dealer would have an option of indefinite duration to acquire the bonds from the plaintiff at the same price which the dealer had originally bid on the bonds (and which the plaintiff was to pay the issuing authority for the bonds), plus a handling charge of 25 cents per $1,000 of par value of the bonds, plus an amount representing the coupon interest on the bonds accruing between the date of issue and the date of the exercise of the option (and not theretofore collected by the plaintiff), plus reimbursement for expenses incurred by the plaintiff.

(4) That the bond dealer, having the option mentioned in subparagraph (3) of this paragraph (d), would be completely free to proceed with prompt and vigorous attempts to make sales of the bonds to his customers at whatever prices the bonds could be sold for, and that the plaintiff would not have any supervision or control over the dealer's sales efforts.

(5) That as the dealer sold the bonds to his customers from time to time, he would furnish the pertinent information to the plaintiff (usually over the telephone, followed by the submission of appropriate invoices), whereupon the plaintiff would make delivery of the bonds to the purchasers in accordance with the dealer's instructions.

(6) That the plaintiff, in connection with the delivery of bonds to the dealer's customers pursuant to the dealer's instructions, would collect the dealer's sales prices from the customers; and that if, upon the disposition of the entire bond issue, the total of the dealer's sales prices exceeded the option price mentioned in subparagraph (3) of this paragraph (d), the plaintiff would remit the difference to the dealer; but that if the total of the dealer's sales prices was less than the option price, the dealer would reimburse the plaintiff for the deficit.

15. (a) According to the unwritten understanding between the plaintiff and a successful bidder-dealer, the plaintiff's funds, rather than those of the successful bidder-dealer, were transmitted to the depository bank of the issuing authority in payment of the purchase price bid by the successful bidder-dealer. The amount paid by the plaintiff and transmitted to the depository bank of the issuing authority was always the bid price of the successful bidder-dealer (plus interest, if any, accruing between the date of issuance and the date of delivery of the bonds). The plaintiff paid the dealer's bid price without attempting to ascertain the then fair market value of the bonds.

(b) The plaintiff retained possession of the bonds in bearer form for comparatively short periods of time (generally not more than 30 days) while the successful bidder-dealer sold the bonds to his customers.

(c) This unwritten arrangement between the plaintiff and the various bond dealers in connection with the municipal bond transactions in question was the same with respect to all dealers.

(d) The 10 percent of the plaintiff's municipal bond transactions in question that involved the secondary market were similarly handled, except that the payment was made by the plaintiff to the selling dealer rather than to the issuing authority.

16. After paying the issuing authority for a new bond issue (or the selling dealer in a transaction involving a bond issue in the secondary market), the plaintiff sent a notice to the successful bidder-dealer in the primary market (or the purchasing dealer in the secondary market) that "the following securities were purchased today." The notice listed the name of the security, its par value, date of issue, name of the bond deal-

er, the amount, denominations, interest rates, maturity dates, numbers of the bonds, first and subsequent coupon dates, Comptroller's registry number, paying agent, name of counsel, and total purchase price (inclusive of accrued interest).

17. The transactions in question were cast by the parties in the form of a purchase of a new issue by the plaintiff from the successful bidder-dealer, subject to the option of the successful bidder-dealer, for an indefinite time period, to repurchase the bonds from the plaintiff at the dealer's bid price on the bonds, adjusted upward for interest accrued after the date of issuance and reduced by the interest actually collected by the plaintiff. This book-value figure was further adjusted by accrued interest not reflected on the plaintiff's books, along with handling charges and other miscellaneous expenses incurred by the plaintiff in connection with delivery of the bonds to the dealer's customers (insurance, postage, and wires), which were charged by the plaintiff to the dealer.

18. When the plaintiff transmitted its cashier's check in payment of the purchase price for bonds, its Bond Department sent a charge memo to its cashier showing a memorandum charge in the amount of the purchase price to the Refunding Bond Account. Pursuant to this memo, a charge was made to that account so that plaintiff's refunding bond account in the general ledger reflected at the end of each day the book balance of municipal bonds held by the plaintiff.

19. The plaintiff maintained a subsidiary ledger with respect to municipal bonds. It set up a separate ledger sheet for each bond issue. On this sheet, there were initially entered the name of the issuer, the date of issue, the name of the dealer, the nature of the bonds, the rate or rates of interest, maturity dates, first coupon date, subsequent coupon dates, par value bonds, and cost of bonds. As sales of municipal bonds were made by the bond dealer to his customers, they were entered on this ledger sheet by the plaintiff. Such entries showed the par value of the bonds sold, the dealer's sales price, the par balance remaining, and

the book balance remaining. Also, as sales were made, plaintiff's Bond Department sent a credit memo reflecting the dealer's sales to its cashier, so that the sale of the bonds could be reflected in the Refunding Bond Account in its general ledger.

20. Each month, interest was accrued through the 25th of the month. The only interest accrued or received by plaintiff was coupon interest at the coupon rate. A debit memo was prepared showing the interest earned on each issue for that month. On the subsidiary ledger sheet, the monthly interest accruals were entered as a book debit and accordingly increased the book balance. When coupons became due, the plaintiff clipped them and collected and kept the coupon interest. On the subsidiary ledger sheet, the collections on the coupons were entered as a book credit and accordingly decreased the book balance. The monthly accruals of interest were credited to an account entitled "Exempt Interest Earned" on plaintiff's general ledger.

21. (a) Because of changing market conditions and customer interest, successful bidder-dealers would immediately commence to offer and sell bonds for future delivery as soon as they were awarded new issues by the issuing authorities. Most of the dealers' sales to their customers were made by salesmen through telephone calls. Dealers also advertised the municipal bonds in financial publications, such as the Wall Street Journal and the "Blue List of Current Municipal Offerings," and they mailed offering circulars to prospective customers.

(b) The plaintiff played no role in the successful bidder-dealers' sales of the municipal bonds to their customers. The dealers exercised complete dominion and control over the sales of bonds; and they were free from any control by the plaintiff in their selling practices. The dealers established their own market prices for the various bond issues, selected their customers, and tried to sell each issue to the public as soon as possible for an overall profit.

(c) Ordinarily, the successful bidder-dealer had sold a substantial portion of the entire bond issue before the bonds were

actually delivered to and paid for by the plaintiff. On the delivery of the bonds after their approval by and registration with the state authorities, the plaintiff would pay the award or purchase price to the issuing authority; and as to all bonds which the bond dealer had sold to his customers before the actual delivery date, the plaintiff would transmit the bonds to the dealer's customers, as directed by the successful bidder-dealer. After the delivery of the bond issue to the plaintiff and the payment of the award price by the plaintiff to the issuing authority, the successful bidder-dealer would continue to market the remaining bonds to his customers, while exercising complete dominion and control over his selling practices.

22. Dealers would exercise their options to acquire bonds from the plaintiff by informing the plaintiff (such information was initially given to the plaintiff over the telephone in the usual situation) that they had sold certain bonds to specified purchasers, and by sending to the plaintiff invoices of the sales made out to the purchasers, together with shipping instructions. Invoices were accompanied by covering letters from the dealers; and such letters would, for example, refer to the bonds as being held by the plaintiff "for our instructions," or refer to the invoices as "covering our purchase from you" of specified bonds. Pursuant to the understanding between dealers and the plaintiff, the submission of such invoices to the plaintiff meant that the dealers had exercised their options to acquire from the plaintiff the bonds covered by the invoices.

23. (a) Upon receiving an invoice from a dealer covering a sale by the dealer to a customer, the plaintiff followed the instructions of the bond dealer pertaining to the delivery of the bonds to the dealer's customer.

(b) In several instances, delivery by the plaintiff of bonds to dealers' customers was temporarily delayed in situations where the plaintiff had pledged the municipal bonds to secure deposits with the plaintiff of public funds of the State of Texas, the University of Texas, and the City of Austin.

(c) The invoice which the plaintiff received from a dealer, together with the bonds covered by the invoice, was sent by the plaintiff to the bank at which the bonds were to be paid for, under instructions that such bank should deliver the bonds to the designated purchaser against payment of the dealer's invoice price, and that such bank should remit (or credit) the purchase price to the plaintiff.

24. Under the plaintiff's instructions to the collecting bank, interest on the bonds accrued to the plaintiff only to the date when the sale of the bonds by the dealer to the purchaser was closed, notwithstanding the circumstances that in many instances bonds would be in transit between the plaintiff and the collecting bank for several days. To the contrary, commercial bank loans bear interest until current funds are received.

25. The successful bidder-dealer obtained an overall profit from his marketing of the entire bond issue if he sold the bonds for a total price greater than the price bid by him to the issuer. Conversely, the successful bidder-dealer incurred a loss from his marketing of the entire bond issue where he sold the bonds for a total price less than the award price. In either instance, the plaintiff looked to and received the aggregate coupon interest on the entire bond issue while the bonds were in its possession.

26. On every sale by a dealer, the plaintiff also sent to the dealer a document entitled "invoice." This invoice showed the bank to which the securities were sent, the name of the issue, the name of the dealer's customer, the payment date, daily additions for interest, the selling price to the customer, and the name of the dealer.

27. On each sale of bonds by a dealer, the sales price was paid over to the plaintiff; and this sales price was entered on the plaintiff's subsidiary ledger sheet as a book credit which reduced book balance. Final settlement with reference to these transactions was not normally made until all bonds in the issue had been sold by the dealer to

his customers. The dealer was charged with the expenses of the dealer's sale—insurance, postage, and wires. The dealer also was charged with the handling charge of 25 cents per $1,000 of par value.

28. When all the bonds of an issue had been acquired by the dealer, a closing statement was prepared by plaintiff and furnished to the dealer. This statement was to the dealer. It reflected final settlement between plaintiff and the dealer. As to the dealer, it showed gross profit or gross loss and charges for postage, insurance, wire, and handling, together with interest accrued on the bonds since the last monthly accrual, or since the bonds were acquired by the plaintiff in case they were not held by it on the monthly accrual date. It then showed the balance due either the dealer or plaintiff. If a balance was due the dealer, plaintiff (at the dealer's election) either remitted the same to him or credited the amount to his account with plaintiff. The statement was a bill to the dealer in case there was a balance due plaintiff. The dealer remitted such balance to plaintiff or, if he had an account with plaintiff, he authorized plaintiff to debit his account with such balance.

29. (a) According to the closing statement and the subsidiary ledger maintained by the plaintiff with respect to each bond issue, when all the bonds in the issue had been acquired by the dealer, the computation of the balance due either the plaintiff or the dealer was made as follows: The total amount due to the plaintiff from the bond dealer included the sum of the following items: (1) the book value of the bonds (the award or bid price of the entire bond issue, adjusted upward for interest accrued after the date of issuance and reduced by the interest actually collected by the plaintiff); (2) accrued interest not reflected on the plaintiff's books; (3) plaintiff's handling charge; and (4) the plaintiff's expenses in connection with the dealer's sales to his customers (insurance, postage, and wires).

(b) Thus, the total amount due the plaintiff could be computed without regard to the success or failure of the distribution of the entire bond issue to the investing public. The plaintiff would owe the bond dealer the sum of the amounts paid by the dealer's customers to purchase the bonds. Therefore, whether the balance on the closing statement was due either to the plaintiff or to the dealer depended entirely on the ability of the dealer to market the entire issue for a total amount greater than the fixed-bid price bid in by the successful bidder-dealer and paid for by the plaintiff to the issuing authority.

30. Both the plaintiff and the bidder-dealers expected that the latter would acquire from the plaintiff bonds which the plaintiff had "taken up" pursuant to requests from the bidder-dealers.

31. (a) In all of the transactions in question (except as indicated in findings 46–48), the successful bidder-dealer, as he sold the bonds to his customers, acquired the bonds from the plaintiff on payment of the book value (i. e., the original cost of the bonds adjusted upward for interest accrued after the date of issue and reduced by interest collected by the plaintiff after that date), plus (1) accrued interest not reflected on the plaintiff's books, (2) reimbursement for expenses (insurance, postage, etc.) incurred by the plaintiff in connection with the delivery of bonds to the bidder-dealer's customers pursuant to instructions from the bidder-dealer, and (3) a handling charge of 25 cents per $1,000 of par value of the bonds.

(b) From January 1965 until April 1970, no bidder-dealer failed to exercise his option to acquire from the plaintiff bonds which the plaintiff had "taken up" at the dealer's request.

(c) In practice and in accordance with the custom in the industry, bidder-dealers always acquired from the plaintiff all bonds which the plaintiff had "taken up" pursuant to their requests, with the exceptions indicated in findings 46–48; and the plaintiff always followed the directions of a bidder-dealer after the latter had sold the bonds to his customers.

(d) In several instances, delivery of bonds to customers of a bidder-dealer was temporarily delayed because the plaintiff had pledged the bonds to secure deposits of public funds in its possession from the State of Texas, the University of Texas, and the City of Austin.

32. The transactions in question were financially advantageous to the bond dealers. Many of these dealers, when the bond issues were ready for delivery and payment, did not have the funds available in their bank accounts to pay the award price bid in by them. The reputation of a bond dealer would have been adversely affected if he had failed to pay the award price; and in, addition, the issuing municipality would have retained the good-faith deposit as liquidated damages.

33. Bond dealers believed that the continued participation of the plaintiff in its municipal bond business depended upon their protection of the plaintiff against the risk of loss from a reduction in the market value of bonds "taken up" and held by the plaintiff. It was believed that the failure of a dealer to insulate the plaintiff from a reduction in the market value of such bonds would be extremely damaging to the dealer in its future municipal bond business with the plaintiff. Dealers would sell bonds "taken up" and in the possession of the plaintiff even in situations where the market price was less than the book value of the bonds, because they desired to maintain the friendship and goodwill of the plaintiff.

34. (a) The plaintiff considered that it was an investor in the bonds which it had "taken up" at the request of bond dealers. The plaintiff carried as assets—which were reflected in its financial reports and call statements—the bonds entered in its Refunding Bond Account.

(b) The municipal bonds subject to the transactions in question were carried by the plaintiff in an asset account captioned "State, County and Municipal Obligations" on the balance sheets of its annual reports for the years 1965 through 1969.

(c) The plaintiff also carried as assets bonds acquired by it which were not subject to the transactions in question. These latter bonds were reflected in the plaintiff's general ledger, call statements, and annual reports in an asset account on its balance sheets under the heading "Other Bonds & Securities."

35. The plaintiff occasionally purchased bonds for its own portfolio in order to obtain the profitable coupon-paying agency for the issuers. These bonds were purchased by the plaintiff from successful bidder-dealers at the market prices offered by the dealers to the public; and they were reflected in the plaintiff's asset account captioned "Other Bonds & Securities." The plaintiff planned to hold these bonds to maturity, but it would occasionally sell some of them in order to reap a profit when the market was favorable. The plaintiff sold these bonds at the highest prices offered for them.

36. It was the understanding of bidder-dealers for whom the plaintiff had "taken up" bonds that the plaintiff was the owner of such bonds while they were being held by the plaintiff to await the exercise by the respective bidder-dealers of their options to acquire the bonds at the agreed purchase price (book value plus accrued interest and agreed charges). The bidder-dealers did not reflect the bonds as assets on their financial statements while the bonds were being held by the plaintiff; and the bidder-dealers' books did not reflect any liability to pay the plaintiff the book value of the bonds held by the plaintiff.

37. (a) Sometimes, when the plaintiff was requested by a successful bidder-dealer to "take up" a desirable bond issue having a par value larger than the plaintiff was able to handle at the time, the plaintiff would get in touch with the Mercantile Bank in Dallas, Texas, or with the Republic Bank in Dallas, Texas, and inquire whether the other bank would like to participate in the transaction. When approached by the plaintiff, the other bank would make an independent check on the credit of the issuing authority; and would agree to participate in such a transaction with the plaintiff only if satisfied as to the financial ability of the issuing authority.

(b) In the event of an affirmative response from the other bank, the plaintiff, upon accepting delivery of the bonds, would transfer to the other bank an agreed portion of the issue.

(c) Normally, in a situation where another bank participated with the plaintiff in "taking up" a bond issue, the plaintiff physically retained in Austin, Texas, the bonds that had been transferred to the other bank, and issued a safekeeping receipt to the other bank. This safekeeping receipt reflected the par amount of the transferred bonds, the name of the issuing authority, the coupon rate of interest, the name of the successful bidder-dealer, the specific bond numbers of the transferred bonds, and the amount paid by the other bank.

(d) If (as was usually the case) the plaintiff had an account with the other bank, the other bank would credit the account of the plaintiff with the original bid price (plus accrued interest) of the bonds transferred to the other bank. If the plaintiff did not have an account with the other bank, the other bank remitted to the plaintiff funds covering the original bid price (plus accrued interest) of the transferred bonds. The plaintiff remitted to the depository bank of the issuing authority the original bid price (plus accrued interest to the date of delivery) for the entire bond issue.

(e) The other bank showed the transferred bonds on its books and records as investment assets.

(f) It was understood by both the plaintiff and the other bank that bonds transferred to the other bank under the circumstances outlined in this finding were subject to the bidder-dealer's option of indefinite duration to acquire the transferred bonds at the original bid price, plus accrued interest and agreed expenses. No representation was made to the other bank that the bidder-dealer was under an obligation to acquire—or that he would acquire—the bonds in question. As a matter of actual practice, however, all bonds transferred by the plaintiff to other banks under the circumstances outlined in this finding were subsequently acquired by the respective bidder-dealers under their options.

(g) When a bidder-dealer exercised his option to acquire bonds which the plaintiff had transferred to another bank, the plaintiff would inform the other bank (usually by telephone) of the exercise of the option. The other bank would then submit to the bidder-dealer an invoice which recorded the par amount of the bonds sold and the bidder-dealer's sale price. The other bank would direct the plaintiff to deliver the bonds as instructed by the bidder-dealer, and would charge the plaintiff's account for the book value of the bonds sold.

38. (a) The plaintiff would "take up" a bond issue at the request of a successful bidder-dealer only if the plaintiff was satisfied with the credit of the issuing authority. If the plaintiff was not satisfied with the credit of the issuing authority, the plaintiff would not enter into such a transaction with the successful bidder-dealer. Although the plaintiff sometimes received from bond dealers financial statements that were submitted voluntarily by such dealers and without any request on the part of the plaintiff, the plaintiff did not make any credit investigation of the successful bidder-dealer in connection with a determination to "take up" a bond issue at the request of such bidder-dealer.

(b) The plaintiff inquired into the credit of the issuing authority by checking the Texas Municipal Report on the issuing authority compiled with the Municipal Advisory Council of Texas, to whose service the plaintiff subscribed, and by checking Moody's rating of the bonds.

39. In numerous instances, the plaintiff, in "taking up" different bond issues at about the same time pursuant to the request of a particular bidder-dealer and holding such bonds subject to the bidder-dealer's option, paid to the depository banks of the issuing authorities sums which, in the aggregate, far exceeded the loan limit of the plaintiff in regard to a single borrower.

40. The plaintiff may not, under regulations of the Comptroller of the Currency—and in fact does not—make loans unless

they are evidenced by a note or some other kind of debt instrument. When the plaintiff makes a loan and takes collateral for the loan, the borrower, in addition to signing a note, must sign a collateral agreement. When the plaintiff "took up" bonds at the request of a successful bidder-dealer, the latter did not execute a note or any other kind of debt instrument.

41. The plaintiff's transactions in question involving municipal bonds were periodically reviewed by bank examiners. The bank examiners classified plaintiff's account captioned "Refunding Bonds Purchased" as an investment account, and further classified the municipal bonds held by the plaintiff subject to the transaction in question as an investment of the plaintiff, as opposed to a loan.

42. During the years in suit, the plaintiff did not make any bond dealer a loan in the traditional sense, which was evidenced by a note or some other kind of debt instrument, either to purchase a new issue of municipal bonds or with municipal bonds as collateral. The plaintiff did make loans to dealers, the proceeds of which were used for purposes other than the purchase of bonds.

43. (a) With exceptions which were quite infrequent, the plaintiff did not, during the years in question, make loans to anyone that did not maintain a banking relationship with it. A borrower just about had to have an account with the plaintiff, and was normally required to maintain a compensating balance. As a general rule, the amount of the compensating balance would equal at least 10 percent of the loan.

(b) The plaintiff entered into the transactions in question with bond dealers without reference to any banking relationship. Many dealers with whom the plaintiff entered into the transactions in question maintained no account with the plaintiff. The highest balance maintained in most instances where dealers did have accounts with plaintiff was quite small, and the accounts were considered as "convenience" or "clearing" accounts. The plaintiff never indicated to any bond dealer that it wanted a deposit balance from the dealer in connection with the transactions in question.

44. (a) During the years in question, the average rate of interest which the plaintiff received on loans was approximately 6 percent. During those same years, the average rate of interest paid on municipal bonds was approximately 3.25 percent to 3.5 percent.

(b) As the plaintiff, during the years in question, was in the 52 percent corporate income tax bracket, the average coupon interest of 3.25 to 3.5 percent on municipal bonds, if tax-exempt to the plaintiff, would have provided plaintiff with an effective return ranging from approximately 6.5 percent to 7 percent, which was greater than its average taxable 6 percent interest return on its individual or corporate loans.

45. In April of 1970, the plaintiff's Board of Directors determined that the plaintiff would discontinue the business of "taking up" bond issues for successful bidder-dealers, with a bidder-dealer having an option of indefinite duration to acquire such an issue from the plaintiff at the original bid price, plus accrued interest and agreed expenses. This decision was made following the holding by the United States Court of Appeals for the Fifth Circuit in *American National Bank of Austin v. United States*, 421 F.2d 442 (5th Cir. 1970), *cert. denied*, 400 U.S. 819, 91 S.Ct. 36, 27 L.Ed.2d 46 (1970), that the transactions between plaintiff and successful bidder-dealers during the years 1962–64 constituted secured loans and, accordingly, that the interest income received by the plaintiff from such transactions was not tax-exempt to the plaintiff.

46. (a) Following the determination by the plaintiff's Board of Directors mentioned in finding 45, all bond dealers in the area were advised that the plaintiff was terminating the business of "taking up" bond issues at the request of successful bidder-dealers, and that all existing options of bidder-dealers to acquire from plaintiff bonds which the plaintiff had "taken up" at their request must be exercised on or before May 1, 1970, or would terminate.

(b) After receiving the notification mentioned in paragraph (a) of this finding, bond dealers exercised their options to acquire from the plaintiff all bonds for which the then-existing market price was in excess of the option price (*i. e.*, the original bid price plus accrued interest and agreed expenses). However, six bond dealers failed and— when requested by the plaintiff to do so— declined to exercise their options with respect to bonds for which the then-existing market prices were less than the option prices. The option prices on the bonds with respect to which the six bond dealers declined to exercise their options aggregated approximately $800,000 to $900,000.

47. Following the refusal by the six bond dealers to acquire from the plaintiff bonds which the plaintiff had "taken up" at their request, and for which the market prices in April 1970 were less than the option prices, the plaintiff consulted with its attorney sometime in May of 1970 to determine whether it had any legal recourse against the six bond dealers. The plaintiff was advised by its counsel that no action could be taken in this matter because the dealers were not subject to any legally enforceable obligation to acquire the bonds from the plaintiff.

48. After the six bond dealers declined to exercise their options, as indicated in finding 46, the plaintiff sold some of the bonds and continued to hold others. With respect to one group of bonds (Montgomery County, Texas, Water District bonds), the plaintiff sold $400,000 par value of these bonds for a price of approximately $240,000, thereby suffering a loss on this sale of more than $160,000.

49. (a) During the years in question (1965–70), the plaintiff in its federal income tax returns excluded from its gross income the income which it received in the form of coupon interest collected or accrued on municipal bonds in its possession from the transactions in question.

(b) The Commissioner of Internal Revenue determined that the interest excluded by the plaintiff from its gross income under the transactions in issue was in reality taxable income received by the plaintiff from the bond dealers for financing their acquisitions of bonds. Such determination was the basis for deficiency assessments, which the plaintiff paid and which gave rise to the present litigation.

KASHIWA, Judge, dissenting:

The majority adopts the recommended opinion of the trial judge without any change. I dissent for I do not agree with the trial judge's holding that the doctrine of collateral estoppel is inapplicable to these cases.

The trial judge admits that the doctrine of collateral estoppel applies "where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where *the controlling facts and applicable legal rules remain unchanged*," citing *Commissioner v. Sunnen*, 333 U.S. 591, 599–600, 68 S.Ct. 715, 720, 92 L.Ed.2d 898 (1948) [Emphasis supplied].[1]

---

1. A more recent Supreme Court ruling on collateral estoppel is in *Sea-Land Services, Inc. v. Gaudet*, 414 U.S. 573, 593, 94 S.Ct. 806, 819, 39 L.Ed.2d 9 (1974), where the Court stated that
   "Collateral estoppel applies
   'where the second action between the same parties is upon a different cause or demand * * *. In this situation, the judgment in the prior action operates as an estoppel, not as to matters which might have been litigated and determined, but "only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered." *Cromwell v. County of Sac* [94 U.S. 351 [24 L.Ed. 195,]] 353. And see *Russell v. Place*, 94 U.S. 606 [24 L.Ed. 214]; *Southern Pacific R. Co. v. United States*, 168 U.S. 1, 48 [18 S.Ct. 18, 27, 42 L.Ed. 355]; *Mercoid Corp. v. Mid-Continent Co.*, 320 U.S. 661, 671 [64 S.Ct. 268, 273, 88 L.Ed. 376]. Since the cause of action involved in the second proceeding is not swallowed by the judgment in the prior suit, the parties are free to litigate points which were not at issue in the first proceeding, even though such points might have been tendered and decided at that time. But matters which were actually litigated and determined in the first proceeding cannot later be relitigated.' *Commissioner v. Sunnen*, 333 U.S., at 597–598, 68 S.Ct. at 719."
   This court has followed the above rule in *Tanker Hygrade No. 18, Inc. v. United States*, 526 F.2d 805, 807, 208 Ct.Cl. 488, 493 (1975), *cert.*

It is clear that the *applicable legal rules* have remained unchanged since the Fifth Circuit's decision in *American National Bank of Austin v. United States*,[2] previously cited in the trial judge's opinion. The trial judge does not state in any part of his recommended opinion that there was an intervening doctrinal change. Neither has plaintiff argued that there has been such a change. The decision of the Fifth Circuit in the first case has been followed by the Sixth Circuit in *Union Planters National Bank of Memphis v. United States*, 426 F.2d 115 (6th Cir.), *cert. denied*, 400 U.S. 827, 91 S.Ct. 53, 27 L.Ed.2d 56 (1970), and *First American National Bank of Nashville v. United States*, 467 F.2d 1098 (6th Cir. 1972), and by a United States District Court in *Third National Bank in Nashville v. United States*, 27 Am.Fed.Tax R.2d 818, ¶ 71–459 (M.D. Tenn., Feb. 16, 1971), *aff'd per curiam* as to another issue, 454 F.2d 689 (6th Cir. 1972). Additionally, this court very recently in *Citizens National Bank of Waco v. United States*, 551 F.2d 832, 839–841, 213 Ct.Cl. 236, 248–253 (1977), in an opinion by now Senior Judge Skelton, expressed its agreement with the first case and all of the above-cited decisions involving the financing by banks of purchases of municipal bonds by bond dealers. Since there has been no intervening doctrinal change between plaintiff's first case in the Fifth Circuit Court of Appeals and the present cases, the bar of collateral estoppel has not been lifted in the present cases by such a change. *Union Bag-Camp Paper Corp. v. United States*, 366 F.2d 1011, 177 Ct.Cl. 212 (1966).

Next is the question of whether collateral estoppel is inapplicable due to a change in the "controlling facts." The trial judge held that there was a change in the "controlling facts." He states at pages 11–12 of his recommended opinion:

Thus, it was the supposed lack of risk on the part of the plaintiff that led the Court of Appeals in the first *American National Bank of Austin* case to conclude that, in substance, the transactions between the plaintiff and successful bidder-dealers during the 1962–64 period were loan transactions. On the other hand, the evidence in our present record shows that, when the crunch finally came and the matter was put to the test, the plaintiff actually bore the "basic risk of ownership of the bonds." According to the evidence in this record, six bond dealers declined to exercise their options, the plaintiff had no legal recourse against them, and, us a consequence, the plaintiff sustained a large financial loss. [Footnote omitted.]

It is significant that in so holding the trial judge did not discuss whether facts equivalent to the evidence in the present case (showing that *"six bond dealers declined to exercise their options, the plaintiff had no legal recourse against them, and, as a consequence, the plaintiff sustained a large financial loss"*) were presented during the litigation of the first case. The trial judge did so even though defendant pointed out that equivalent evidence had been presented by the present plaintiff in the first case—especially with regard to the Municipal Securities Company of Dallas, Texas, owned by Mr. Harold J. Silver. As shown below, identical and equivalent facts, as in the six bond dealer incidents of May 1970, were presented in the first case. The Fifth Circuit carefully considered all the facts presented, including the facts relating to losses the present plaintiff incurred from its dealings with Mr. Silver, and concluded that in economic substance the relationship plaintiff had with the bond dealers was that of a secured lender. Since I find the matters raised in the second suit identical with those decided in the first case, I believe the doctrine of collateral estoppel is applicable to this case. *Commissioner v. Sunnen, supra.*

denied, 426 U.S. 920 [96 S.Ct. 2624, 49 L.Ed. 373] (1976). *See also Carter-Wallace, Inc. v. United States*, 496 F.2d 535, 204 Ct.Cl. 341 (1974), wherein we applied the rule of collateral estoppel as expanded in *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971).

**2.** Hereinafter referred to as "the first case."

Fortunately, defendant introduced into evidence during the trial of these cases the pleadings, stipulation of facts, and a complete transcript of the oral testimony adduced in the first case. See Government's Exhibit 2. The stipulation is lengthy, containing 43 paragraphs, and the transcript of oral testimony covers 176 typewritten pages. A careful examination of the Government's Exhibit 2 demonstrates to me that the trial judge's conclusion, that the plaintiff's evidence regarding the six dealers represented an "additional circumstance of considerable significance," is erroneous. The identity of facts between the present cases and the first case is illustrated also by the trial judge's first 44 findings which, except for his legal conclusions relating to the plaintiff's alleged ownership of the municipal bonds and the dealers' so-called repurchase options, set forth the same factual background as involved in the first case.[3]

As found by the Fifth Circuit and the trial judge, the underwriting and distribution of new municipal bond issues in Texas were facilitated by the dealers' selling efforts and the plaintiff's funds. The transactions in question were financially advantageous to the dealers who frequently did not have sufficient cash in their bank accounts to pay their bid prices to the issuing authorities at the time of actual delivery of the entire bond issue. The dealers would not obtain sufficient cash to pay their bid prices until they were paid by their customers from the sale of the bonds, but the dealers avoided the forfeiture of their good faith deposits to the issuing authorities by having the plaintiff supply the funds to pay their bid prices to the issuers. The plaintiff kept possession of the bonds until the dealer sold them to his customers. Plaintiff would further collect interest accruing on the bonds held by it while the dealers would realize a profit or incur a loss depending upon the difference between the market price for the bond issue and the bid price, plus reimbursement to the plaintiff for the dealers' expenses.

The record before the Fifth Circuit in the first case revealed that while no dealer during the years 1962 through 1964 (the years in issue in the first case) had failed to exercise his so-called repurchase option, to bond dealers in prior years had failed to pay plaintiff the bid price of bonds held by the taxpayer, a significant fact which the trial judge ignored.[4] At the trial of the present cases, plaintiff's former president testified regarding these two instances in which dealers declined to pay taxpayer the bid price of bonds held by it. See Trial Transcript, page 109.

The additional evidence presented by plaintiff in this case and set forth by the trial judge in his findings 45 through 48—relating to the six bond dealers who declined to pay plaintiff the bid price for bonds held by the plaintiff, plaintiff's alleged lack of any legal recourse against the six dealers (based on advice of plaintiff's counsel), and plaintiff's loss incurred from the sale of one group of these bonds—was also present in the first case. The Fifth Circuit was squarely confronted with simi-

3. In Government's Exhibit 1b, Answers to Interrogatories, filed by plaintiff in the present cases, plaintiff admits:

"1. The agreements between the plaintiff and all of the dealers relating to the acquisition and ownership of municipal bonds by the plaintiff and the option of the dealers to acquire such bonds during the years 1962 through 1964 were the same with respect to each dealer. * *

"2. The agreements between the plaintiff and all of the dealers relating to the acquisition of municipal bonds by the plaintiff and the option of the dealers to reacquire such bonds during the years 1965 through 1970 were basically the same as in the years 1962 through 1964. * * *

"3. The rights and obligations of the plaintiff and the dealers under the agreements remained basically the same with respect to the purchases of municipal bonds made by plaintiff for all years."

4. It was the plaintiff who introduced the evidence of the prior two defaults in the first case in its endeavor to persuade the Fifth Circuit that it was the owner of the bonds. The Fifth Circuit considered the evidence of prior defaults and stated, "Indeed only twice in the history of taxpayer has a dealer failed to cause taxpayer to be paid the book value of bonds for which taxpayer had paid, together with taxpayer's handling charge and incidental expenses." Still, the Fifth Circuit held plaintiff was not the owner of the bonds.

lar evidence showing that dealers in two prior instances declined to pay plaintiff the bid price for bonds held by the plaintiff, that plaintiff had no legal recourse against these dealers (again based on advice from plaintiff's counsel), and that it sustained losses from those bonds.[5]

Since the additional facts relating to plaintiff's isolated losses in six instances in May 1970 are merely repetitious of similar evidence before the Fifth Circuit in the first case, the taxpayer should be barred by collateral estoppel. Plaintiff has not offered any evidence which in substance was

**5.** See Defendant's Exhibit 2, specifically the transcript of testimony in the first case in which the following testimony appears:

"Q  Now, have you ever—have you had any dealers who did not exercise their option?

"A  Yes, we have had dealers who have exercised—have not exercised their option.

"Q  How many?

"A  I can recall two.

"Q  Would you tell us about them?

"A  Yes, we had one dealer back in these years who had sold us approximately a million and two or a million three hundred thousand dollars worth of securities, and he purchased back from us some of the securities, but he didn't purchase back all of the securities.

"Q  What kind of securities did he purchase from you?

"A  He purchased the securities from us that he could sell on the market at a profit.

"Q  He left you with the loss securities?

"A·  The securities he did not purchase when we inevitably disposed of them was at a loss.

"Q  Did you sell them immediately, or hold them?

"A  We held them for awhile, waiting for the market to improve.

"Q  Do you recall how many issues of bonds were involved?

"A  I would roughly state somewhere between thirty, thirty-three, thirty-four, somewhere in there.

"Q  And how many did he leave you with?

"A  Twenty-two or three.

\*    \*    \*    \*    \*    \*

[The name of the dealer who defaulted was Mr. Harold J. Silver, doing business as Municipal Securities Company of Dallas, Texas.]

\*    \*    \*    \*    \*    \*

"Q  Can you recall that individual's name?

"A  Yes; his name is M. A. Hagberg [of Mr. Silver's company].

"Q  All right.  Now, what, in substance, did you tell that gentleman?

"A  He shipped out the securities that had a profit in them, and we credited his account with the profit, which amounted to approximately $38,000.00.

"Q  All right.  Now, was the account sort of inactive?  Is that what caused you to call?

"A  No, it wasn't.

"Q  What happened that caused you to call this man?

"A  He only shipped out the bonds that had a profit in them, and the ones that didn't have a profit in them, I noticed they weren't going out.

"Q  How do you know they didn't have a profit in them?

"A  How did I know?  I know the market every day.

"Q  In other words, you—the bonds that were left, you determined that the market for these bonds was poor?

"A  Correct.

"Q  Is that what caused you to call this man?

"A  I called him to—in a falling market, to ask him if he wanted to purchase these securities.  If he did not, I would sell them in the market.

"Q  Does the bank make a practice of selling bonds at a loss?

"A  We hope not.  We have had a few—

\*    \*    \*    \*    \*    \*

"Q  Mr. Houser, we left off where I was questioning you about your calling the Municipal Securities Company to see about them taking up some bonds.

"A  Yes.

"Q  Now, you had said that you had determined that the market was poor, and that triggered your call to the manager of that company; is that correct?

"A  Yes, that is correct.

"Q  Now, what exactly did you tell that gentleman when you called him?

"A  Well, I called the man there, Mr. Hagberg, and stated to him that *we had heard he was going to discontinue his municipal bond account*, and that he had purchased bonds in the account which were of premium value and had sold them, and I asked him did he want to purchase the balance of these securities.  [Emphasis supplied.]

"Q  Now, where had you heard that they were going to discontinue business?

"A  They were going to discontinue their municipal bond department.

"Q  Where had you heard that?

"A  Several dealers in the market had told me that they had offered them securities, and that they had stated that they didn't want to buy any more securities, that they were going to close out their municipal bond department."

\*    \*    \*    \*    \*    \*

The foregoing testimony was adduced on plaintiff's direct examination of its own witnesses and cross examination by the defendant.  A more complete transcript of the relevant testimony is contained in an appendix attached to defendant's reply brief in the present cases filed July 19, 1977.

not considered and decided adversely to it in the prior proceeding. See *United States v. Creek Nation*, 476 F.2d 1290, 1303, 201 Ct.Cl. 386, 407 (1973). In my view, the "controlling facts" have remained unchanged. In both cases, taxpayer bore some small degree of risk, not as an owner but as a lender.

This court emphasized in *Hercules Powder Co. v. United States*, 337 F.2d 643, 645, 167 Ct.Cl. 639, 644 (1964), that to lift the bar of collateral estoppel the new factual elements, if any, must be material and have legal significance. As I view it, the only variance in the facts stressed by the plaintiff is not material and has no legal significance as to the issue in the present cases.

**6.** The Fifth Circuit opinion reads:

"The only real risk that taxpayer incurred during the course of its transactions with the bond dealers was that the successful bidder for high-grade ('BAA' or above) bonds would, in a falling market, be either financially unable to take the bonds from taxpayer or be indifferent to the consequences of not taking them. Taxpayer enjoys a position of predominance in the distribution of municipal bond issues in Texas. Its refusal to provide its unique services to a bond dealer would bode ill for that dealer's business in the Texas bond market. The record shows clearly that dealers, so long as they desired to continue marketing new issues of Texas municipal bonds, insulated taxpayer from market fluctuations in the price of bonds *that taxpayer held. The testimony of taxpayer's own witnesses establishes that bond dealers understood that taxpayer's continued participation with dealers in new-issue transactions depended upon the continued protection of taxpayer from the risk of loss in a falling market. Thus the basic risk of ownership of the bonds was incurred by the dealers."* [*American National Bank of Austin v. United States*, 421 F.2d at 453.]

The accuracy of the Fifth Circuit's holding, that in substance the plaintiff was a secured lender because of its economic power, is dramatically illustrated by the losses which plaintiff did have. The evidence in the record shows plaintiff had eight dealers who defaulted (two prior to 1962 and six in May 1970). Of these eight, it is established that seven of the dealers defaulted only when plaintiff lost its economic leverage over them due to the dealer going out of the municipal bond business (Mr. Silver's case) or the plaintiff's discontinuing its municipal bond business. Had plaintiff not discontinued its municipal bond business in April 1970, it is highly probable that the six defaults in May 1970 would not have occurred.

The Fifth Circuit in the first case expressly recognized that plaintiff bore the risk that the successful bidder-dealer on issues of high grade municipal bonds might not pay plaintiff the bid price for the bonds in a depressed market. The court concluded that the dealers were extremely unlikely to do so because of their business and economic dependence upon the plaintiff to participate with them in marketing new issues of Texas municipal bonds.[6] Evidence of isolated actual losses sustained by the plaintiff, such as those in May 1970, did not persuade the Fifth Circuit that plaintiff was not a secured lender. Nor should this court hold differently in this case.[7]

**7.** The record before the Fifth Circuit was much more favorable to the plaintiff's position than the record in the present cases. The plaintiff there had entered into 33 transactions involving an aggregate total of $1,200,000 of municipal bonds with a financially solvent dealer who chose to pay the book value only on those bonds which he could sell on the market for a profit and refused to pay to taxpayer the book value on the remaining 22 issues of bonds with an approximate total dollar amount of $800,-000, which loss the dealer would incur. This dealer was discontinuing its municipal bond business while remaining in the general securities business and could have paid the bid price of the bonds to the plaintiff. Plaintiff was subsequently advised by its attorneys that it had no legal recourse against this dealer and it further sustained actual losses when it sold the bonds on the market.

In the present cases, plaintiff points to the six dealer losses in 1970. In support thereof, plaintiff points to its trial exhibits (Plaintiff's Exhibits 20–30), which show that it paid the bid price of bonds in 1965 through 1968 and 1970 and held them until May 1970 when the six bidder-dealers declined to pay the bid price to it. From these skimpy facts, plaintiff unconvincingly surmises that these six bidder-dealers as early as 1966 or 1967 did not intend to pay the bid prices and would leave it with a loss from these bonds.

None of the six bidder-dealers testified as to whether they intended to repay the bid price on the bonds held by the taxpayer during the years in question, and the trial judge made no findings on this matter. Defendant notes that the bulk of the bond issues (Plaintiff's Exhibits 20–30) upon which the six dealers failed to pay the book value represent non-rated issues. Such issues represented only a very small minority of the bonds involved in the transactions in question. As explained by Mr. Wroe, tax-

In order to lift the bar of collateral estoppel, the plaintiff would have to present evidence that the area bond dealers as a regular course of action throughout the years in question declined to pay plaintiff the bid price for bonds where the then-existing market price was less than the book value reflected on the plaintiff's books. In short, the plaintiff would have to demonstrate that Texas municipal bond dealers actually treated their so-called repurchase options as genuine business options which would be exercised only when the market price of the bonds exceeded the option price.

The undisputed facts in the record are squarely to the contrary. While the plaintiff remained in its municipal bond business from January 1965 through April 1970, and participated with area bond dealers in thousands of the transactions in question involving millions of dollars of new issues of Texas municipal bonds, no bond dealer failed to pay plaintiff the bid price for bonds held by the plaintiff, even where the then-existing market price was less than the book value reflected on the plaintiff's books. Hence, the bond dealers, as in the prior suit, continued to protect the plaintiff against the risk of loss in a falling market.

The trial judge, therefore, failed to recognize that the action of the six bond dealers in May 1970 does not represent a significant factual distinction from the earlier litigation because the area bond dealers at that time were no longer economically dependent upon the plaintiff to help them market municipal bonds in Texas. The plaintiff had previously informed them in April 1970 that it was immediately withdrawing from its municipal bond business. The Fifth Circuit recognized that if the dealers no longer needed to utilize the plaintiff's services to underwrite and distribute municipal bonds in Texas, they would cease to insulate the plaintiff from loss. In the case of the Municipal Securities Company, owned by Mr. Silver, specifically referred to in footnote 5, Mr. Silver decided to terminate his municipal bond business and remain in the sale of stocks only. Mr. Silver's quitting the municipal bond business caused plaintiff to lose its leverage against Mr. Silver. In the present cases, plaintiff, by terminating its municipal bond business, lost its leverage against the dealers who obviously would no longer be concerned about the adverse impact upon their businesses from the plaintiff's refusal to furnish its services to them. Therefore, in the first case the effect of the loss of leverage was considered on evidence presented by plaintiff regarding Mr. Silver and another bond dealer. Plaintiff again in the present cases attempted to relitigate identical facts relative to the loss of leverage on six bond dealers. He is not at liberty to do so under the doctrine of collateral estoppel, which prohibits relitigation of same issues.[8]

It should be remembered that collateral estoppel "is designed to eliminate the expense, vexation, waste, and possible inconsistent results of duplicatory litigation." *Hoag v. New Jersey*, 356 U.S. 464, 470, 78 S.Ct. 829, 834, 2 L.Ed.2d 913 (1958). In tax cases, the doctrine of collateral estoppel relieves the Government and taxpayer from "redundant litigation of the identical question of the statute's application to the taxpayer's status." *Tait v. Western Maryland Ry.*, 289 U.S. 620, 624, 53 S.Ct. 706, 707, 77 L.Ed. 1405 (1930). This court has, in *Tanker Hygrade No. 18, Inc. v. United States, supra* note 1, and *Carter-Wallace Inc. v.*

payer's president during the years in question, taxpayer normally agreed to pay the bid price only on high grade (i. e., BAA, A, AA, AAA) municipal bonds; but occasionally it would do so on non-rated issues. The dealers presumably would need more time to sell and would have greater difficulty in finding a market for a non-rated municipal bond issue.

8. I do agree that a "controlling fact" was changed when plaintiff notified the bond bidder-dealers in April 1970 that it was discontinu-

ing its municipal bond business. At that point the economic substance of plaintiff's relationship with the dealers was changed, for plaintiff lost its economic power to protect itself against loss. Subsequent to April 1970 plaintiff may well have been the owner of municipal bonds for tax purposes. But we do not have that issue before us. We are here dealing with the period starting in 1965 and ending in April 1970.

*United States, supra* note 1, applied the doctrine of collateral estoppel in accordance with the views and purposes above expressed by the Supreme Court. The trial judge, by refusing to apply the doctrine of collateral estoppel in the present cases, creates an inconsistent result by duplicatory litigation. The Fifth Circuit, Sixth Circuit, and the Tax Court have all decided for the defendant in similar cases. Now this court takes the opposite view. I regret to see such a split with the other courts for the reasons expressed in this dissent. Collateral estoppel should be applied to preclude plaintiff from relitigating the present cases and the decision of the Fifth Circuit should be followed.

### CONCLUSION OF LAW

Upon the trial judge's findings and foregoing opinion, which are adopted by the court, the court concludes as a matter of law that the plaintiffs are entitled to recover, together with interest as prescribed by statute, and judgment is entered to that effect. The amount of the recovery will be determined in subsequent proceedings under Rule 131(c).